Walter **HILDEBRAND**, Libelant,

v.

S. S. **COMMANDER**, her engines, etc., in rem, and Marine Carriers Corporation, in personam, Respondents.

No. 8497.

United States District Court
E. D. Virginia,
Norfolk Division.

Dec. 8, 1965.

Howell, Anninos & Daugherty, Henry E. Howell, Jr., Norfolk, for libelant.

Seawell, McCoy, Winston & Dalton, Harry E. McCoy, Norfolk, for respondents.

WALTER E. HOFFMAN, Chief Judge.

On May 6, 1964, libelant was serving as second officer aboard the COMMANDER then at Rotterdam, Holland. One Dominic Romano was the third officer aboard the same vessel. The two men had known each other for several years and they signed aboard the vessel at Norfolk on December 27, 1963. They had exhibited no differences prior to May 6, 1964. Earlier that day Romano approached libelant to request him to relieve Romano on his 10:00 P.M. watch that night. Libelant indicated that he might consider such action if he was not too tired but mentioned that he, the libelant, was required to take the 4:00 A.M. watch on the following morning.

At approximately 5:15 P.M. on May 6, 1964, shortly after supper, Romano came to libelant's quarters to renew his request, at which time libelant told him that he was too tired to serve as Romano's relief. Romano left and returned about five minutes later. Romano was shouting and it was obvious that he was angry. He told libelant that the chief mate had agreed to stand his watch. Libelant replied to the effect that he didn't care as it was of no concern to him. Thereupon Romano, without warning, struck libelant with his fist.[1] The force of this blow was sufficient to knock out an upper middle front tooth (No. 8) and cause a marked swelling on the left side of the face. Libelant grabbed Romano and they struggled, finally reaching the port officer's passageway outside libelant's quarters where libelant was on top of Romano. During the struggle the chief mate, Suder, came upon the men and ordered the libelant to get up. When Romano arose, he directed his attention to Suder, pulling his glasses off, drawing a pocket knife, and threatening Suder. The argument finally subsided when Suder took hold of a detachable emergency light weighing about ten pounds, which he told Romano he would hit him with if Romano did anything further. Romano immediately became calm and walked off as though nothing had happened.

There is no evidence that libelant ever struck or attempted to strike Romano. The chief mate did not see libelant strike any blow. Libelant denies being the aggressor in any manner, other than to act in self defense in grabbing and tussling with Romano. All the evidence points to an unprovoked attack upon li-

---

1. There is some indication that Romano struck libelant at least twice.

belant by Romano on the occasion of his visit to libelant's quarters.[2] There is no evidence that any of the parties involved had been drinking—a factor that is generally predominant in the usual "sailor's brawl."

■ An incident at Philadelphia prior to the voyage to Rotterdam is of significance but not, in the judgment of the Court, controlling. Another seaman, Reed, was slightly injured when a fellow crew member rolled out of his bunk and accidentally struck Reed with his foot. Reed reported the matter to the master who told him to go to the lounge and lie down. While in that position Romano entered the lounge and asked Reed, "What the h... are you doing there?" Reed replied that he had a right to be there, whereupon Romano told Reed to get up or else he would beat him up, and demonstrated his intentions by pounding one fist in his other hand. About that time the port engineer entered the lounge and told Romano to stop.[3] While this incident definitely establishes the character of Romano, we do not believe that, standing alone, it is sufficient to impose notice to the shipowner of any vicious propensities on the part of Romano and, therefore, the claim of negligence must fail.

■ We think, however, that the totality of the circumstances sustains the conclusion that libelant has met the burden of proving the unseaworthiness of the vessel where no prior notice is required. Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354. Perhaps the use of a fist, without more, should not be construed as an indication that the seaman has a savage and vicious nature, but the unwarranted and unprovoked attack coupled with the second unwarranted threat with a knife, his action in pulling the glasses off the chief mate, and his apparent uncontrollable temper,

plainly characterize Romano as being an incompetent crew member of a savage and vicious nature, who is unequal in disposition and seamanship to the ordinary men in the calling. We do not think it to be of any great importance that the threatened use of a pocket knife was directed against the chief mate and not against libelant. Indeed, in Boudoin v. Lykes Bros. S. S. Co., supra, the events following on the heels of the assault were considered by the Supreme Court even though these subsequent acts were directed to a mate and not against the assaulted seaman.

■ Respondent's reliance upon Jones v. Lykes Bros. Steamship Co., 2 Cir., 204 F.2d 815, is misplaced. Judge Learned Hand classified the fight between plaintiff and his aggressor as a "sailors' brawl" confined to the use of fists with no evidence as to any attempt to use a dangerous weapon. More favorable to respondents is Connolly v. Farrell Lines, Inc., 1 Cir., 268 F.2d 653, but in that case the plaintiff armed himself with a broken bottle and advanced about 20 feet toward the party committing the assault; the court concluding that the assaulting seaman's actions *thereafter* were not of such vicious character as to render him unfit for service as a seaman. The court observed that this was not a premeditated attack. And in Walters v. Moore-McCormack Lines, Inc., 2 Cir., 309 F.2d 191, with a vigorous dissent by Judge Friendly, we note a tendency to require a showing of a dangerous weapon coupled with the background of character traits or personality disorders, with the court avoiding any express ruling as to whether there can be an assault of such a vicious nature (where no dangerous weapon is used) as to warrant a finding that the assailant had a character which rendered the ship unsafe. This Court is inclined to agree with Judge Friendly's dissent. We think that each of these assault cases

2. Romano's quarters were located on the opposite side of the vessel, approximately 25 feet away.

3. The port engineer's deposition was sought to be taken but it developed that he had no recollection of Reed, Romano, or the incident. No attempt was made to transcribe this deposition.

must turn upon the individual facts bearing in mind the use or attempted use of a dangerous weapon, the extent of any provocation, a determination as to who was the aggressor and the force used to repel any assault, the history of prior incidents touching the character traits of the assailant, evidence of contrition, and the overall totality of circumstances.[4] Certainly when an assailant acts under no provocation whatsoever and his movements have not been stimulated, by intoxicating beverages so frequently leading to the typical "sailors' brawl", such facts, standing alone, go a long way in establishing the seaman as being of a vicious nature.

While we do not deem it necessarily controlling, the fact that the assailant (Romano) was the third officer on the vessel when he attacked the libelant who was the second officer significantly suggests that Romano was not an officer equal in disposition to the ordinary officer. Handley v. United States, S.D.N.Y., 157 F.Supp. 616, 619. In short, we think that other officers and members of a crew of a vessel have the right to expect that the character and behavior of an officer will be somewhat better than that of an ordinary seaman.

■ Turning to the issue of damages, the physical evidence of the assault has been heretofore mentioned. The loss of the upper middle front tooth constitutes the permanent injury. This required the installation of a seated bridge kept in place by connection with the teeth on either side. Libelant initially reported to the Public Health Service Hospital at Norfolk on May 22, 1964, following his return from Rotterdam. He was not disabled on the return voyage which ended at Philadelphia on May 19, at which time the master gave him a slip for hospital treatment. As Norfolk was his home, he returned to this area. After being x-rayed on May 22, 1964, he was afforded dental treatment (not connected with the assault) on four occasions during June and July. Libelant was never declared unfit for duty. His statement to the effect that he was unable to get an appointment until late July for replacing the tooth broken as a result of the assault was due to the fact that a new staff was scheduled to report in July. However, it appears from the hospital record that a Dr. Garrett performed work on libelant's teeth as early as July 15, 1964, but the tooth destroyed by the assault was not serviced until September 14, and within five weeks thereafter this work had been concluded by the same dental surgeon. In the interim period between May 19 and October 7, libelant earned approximately $500.00 while serving as a night mate in the Norfolk area. He never attempted to ship out during the five months in question; nor did he seek the attendance of a private dentist. He could have sailed coastwise if he did not wish to remain away for an extended period. While we do not find that he was required by law to go to a private dental surgeon, we feel that it is totally unrealistic to support libelant's theory that he is entitled to recover loss of earnings for approximately five months, subject to a credit for the amount earned as a night mate. Any appointments made for dental work could be readily adjusted to his voyages.

We find that the maximum period of partial disability should be limited to two weeks at a total loss of $500.00. We have not charged against this sum any credit for his earnings as a night mate as this income would only be appropriate for the purpose of credit in the event a longer period of partial disability was fixed. For the loss of the tooth, discomfort, pain and embarrassment, libelant is entitled to an award of $3,000.00, making a total award of $3,500.00.

Adopting this memorandum in lieu of specific findings and conclusions, as provided by Admiralty Rule 46½, an appropriate decree may be presented.

4. See the extended discussion of authorities in Clevenger v. Star Fish & Oyster Company, 5 Cir., 325 F.2d 397.