Henry Vernon BACCUS, Appellant,

v.

AMERICAN STATES INSURANCE
COMPANY OF TEXAS,
Appellee.

No. 2–92–180–CV.

Court of Appeals of Texas,
Fort Worth.

Nov. 9, 1993.

Dwain Dent, The Dent Law Firm, Denning Schattman, Fort Worth, for appellant.

John Cayce, Jr., Shannon, Gracey, Ratliff & Miller, Fort Worth, for appellee.

Before LATTIMORE, HICKS and FARRAR, JJ.

## OPINION

FARRAR, Justice.

This is an appeal from a jury verdict in a suit for benefits under the Workers' Compensation Act. Appellant, Henry Vernon Baccus, brings two points of error: the jury verdict was so against the great weight and preponderance of the evidence as to result in an unjust judgment and, the trial court erred in setting aside its order granting a new trial. We agree the verdict was against the great weight and preponderance of the evidence. Because this issue is dispositive, it is not necessary to reach appellant's point of error regarding the order for new trial. Tex. R.App.P. 90(a).

We reverse and remand for new trial.

In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider and weigh all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam); *Ford Motor Co. v. Nowak,* 638 S.W.2d 582, 585 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). So considering the evidence, if a jury finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959) (per curiam); *In re King's Estate,*

150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam).

The Supreme Court of Texas has cautioned the courts of appeals to detail the evidence relevant to the issue in consideration and clearly state "why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (opinion on reh'g). Further, the supreme court has instructed that in our opinions we should state in what regard the contrary evidence greatly outweighs the evidence in support of the jury's verdict. *See id.; see also Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986) (per curiam).

At trial, the parties agreed and stipulated that appellant sustained a compensable injury in the course of his employment when he fell off a six foot scaffold on June 15, 1989. The evidence showed that appellant suffered a fractured calcaneus and a back injury as a result of the fall. The issues before the jury were whether appellant's incapacity was total or partial, and what was the duration of the incapacity. In answer to the special questions submitted in the court's charge, the jury found:

1. Appellant's injury was a producing cause of total incapacity for the period June 15, 1989 to April 19, 1990.
2. Appellant's injury was a producing cause of partial incapacity for the period April 20, 1990 to May 1, 1991.

The jury was given these definitions:

'TOTAL INCAPACITY' does not imply absolute inability to perform any kind of labor, but means that one is disabled from performing the usual tasks of a workman, not merely the usual tasks of any particular trade or occupation, to such an extent that he cannot get and keep employment performing the usual tasks of a workman.

'PARTIAL INCAPACITY' means any degree of incapacity less than total incapacity, whereby a person suffers a reduction in earning capacity.

A person cannot have both total and partial incapacity at the same time.

'EARNING CAPACITY' means ability and fitness to work in gainful employment for any type of remuneration, including salary, commissions, and other benefits, whether or not the person is actually employed. It does not necessarily mean the actual wages, income, or other benefits received during the period inquired about.

At trial, appellant provided a detailed employment history. He testified he had not completed high school and had been employed as a laborer and carpenter all his working life. He began as an apprentice carpenter in 1972, advanced to journeyman two years later, and ultimately became a full carpenter. Appellant installed ceilings, walls, doors and trim. This work required the use of stilts, the climbing of ladders and was frequently performed at sites where the ground was uneven. He was expected to lift and carry doors, boxes of tile and pieces of sheet rock; most loads weighed between seventy-five to eighty pounds. It was appellant's observation that every worker had to carry as much as he could and work efficiently. Those who did were offered additional employment; those who were not productive got laid off. Appellant had little difficulty finding work and he was often called back to work for former employers.

In addition, appellant testified that he had been involved in a car accident in 1984. His back and neck were injured, and he was unable to work for eight weeks. His back healed relatively quickly, but he continued to have problems with his neck which required follow-up treatment. During this time, appellant had to limit overhead work. The evidence shows appellant was last seen for this injury in July 1986. Appellant resumed his former work activities which included using stilts, climbing ladders and installing ceilings.

Approximately 120 days prior to the injury giving rise to the instant case, appellant began work for Watson Commercial. He worked as a carpenter and installed ceilings, erected interior walls and hung interior doors. His work involved carrying loads of sheetrock, climbing ladders, wearing stilts, bending and stooping. Appellant worked eight hours a day, five days a week, unham-

pered by any ill effects from the 1984 car accident. On June 15, 1989, appellant fell from a six-foot scaffold and shattered his calcaneus.

Following his injury, appellant received extensive medical treatment and therapy. He was unable to perform any work for ten months. On April 19, 1990, he found employment helping his brother install ceilings at Carswell Air Force Base. His brother handled the sheetrock, and appellant was limited to operating a screw gun. Climbing ladders was difficult, and he moved slowly. Appellant worked for two weeks. His limp was noticed by the supervisor, and his job performance was adversely affected. When the crew moved on to another site, appellant was not offered additional work.

One week later, appellant found temporary work at Tarrant County Junior College (TCJC). He was not required to complete an application or take a pre-employment physical, and he did not disclose his work limitations. He worked for six months, but other workmen were available to carry his tools. During this time, he continued to have problems with his foot, leg and back which were aggravated by walking, climbing, bending and stooping. He continued to receive medical treatment. When the job ended in January 1991, he looked for additional employment without success.

Appellant testified that he visited the state unemployment office and completed an application on April 30, 1991. He indicated on the application a lifting limit of forty-five pounds. The unemployment representative crossed out the limitation. Appellant visited with over thirty potential employers. When he disclosed his weight lifting restriction, he was told they could not use him. Subsequently, appellant decided to open a vehicle inspection shop. The shop did not produce sufficient income to cover expenses or pay any salary.

Appellant's treating physician testified appellant had shattered and displaced his calcaneus and that this injury had caused damage to appellant's lower back. The physician testified that in all reasonable medical probability, appellant's current back pain was the result of the 1989 fall, not the 1984 auto accident. The doctor further testified appellant's injuries rendered him unable to perform the normal work of a carpenter and appellant was unable to perform the usual tasks of a worker, including repetitive bending, lifting, stooping, and carrying, forty-hours per week. The physician gave appellant a work release containing a forty-five pound lifting limitation, lifting to be on an infrequent basis only, and a restriction that he was not to walk on uneven ground. There were numerous jobs appellant could perform providing everything went right and nothing broke down or went wrong so that appellant would not be required to push, lift, climb, or walk on uneven surfaces.

Plaintiff's exhibits included a chronology of medical assessments regarding his physical condition. These include the treating physician's periodic reports to appellee.

June 15, 1989:

RIGHT FOOT/RIGHT ANKLE: Examination of the foot and ankle reveals a comminuted fracture of the calcaneus. The tarsal and metatarsal bones are normal.

. . . .

THORACIC SPINE: Examination of the thoracic spine reveals an occult spina bifida at S1. Otherwise, no abnormality is noted except a mild scoliotic curvature.

. . . .

LUMBAR SPINE: Examination of the lumbar spine and lateral view does not reveal evidence of a fracture or dislocation. Degenerative osteophytic spurs are mild at the L4 and L5 vertebral body.

. . . .

signed: CRYS SORY, M.D.

June 15, 1989:

J. DAN WEATHERS, M.D.

. . . .

DIAGNOSIS: 1. Acute comminuted fracture, right os calcis.

2. Acute lumbosacral strain.

3. Contusions, right elbow and thumb.

December 6, 1989:

[Appellant] had a very comminuted, severely fractured right calcaneous [sic]. He still has alot [sic] of pain in the subtalor

joint. He will see Dr. Javier Arena for a second opinion and he will return in one month for another evaluation.

. . . .

James M. Thomas, M.D.

March 8, 1990:

There is almost no subtalor motion whatsoever. There is a considerable amount of pain.

This patient will be limited in his activities in the future and he has a 30% physical impairment of his right lower extremity due to loss of motion of the subtalor area and the pain that he will have permanently.

. . . .

James M. Thomas, M.D.

April 5, 1990:

He still has a moderate amount of pain in his ankle, but he is able to get around quite comfortably as long as he does not stress it.

. . . .

James M. Thomas, M.D.

June 13, 1990:

He still has alot [sic] of pain in his right foot which is certainly understandable due to the severity of injury that he had. He also has pain in his low back that radiates down his leg.

I feel that this is on the basis of the way he is walking and he does have some back component. He has an abnormal callous on his foot and he has evidence of walking on the side of his foot.

Examination revealed that he had tenderness in the ankle joint noted with any range of motion. He has very little motion of the subtalor joint with pain being illicited with the eversion/inversion movement.

It is my impression that this gentleman will have future problems with this ankle. He may need a triple arthrodesis and if so he will have wear and tear on his ankle that will increase the problem and it will increase the soreness in his low back. I do not feel that he has reached a place that we can predict that he will have future problems. I doubt that he will ever return to a type of job that requires walking on rough terrain. I feel that in the future he will have difficulty in going up and down ladders or walking on uneven roofs. He will return in three months for another evaluation.

. . . .

James M. Thomas, M.D.

October 22, 1990:

This patient was seen today as a referral from Dr. Thomas' office. As you know Dr. Thomas had a very sudden illness and recently expired. This patient is still complaining of mild to moderate pain and discomfort involving his right ankle and some back discomfort as well. He has also complained of some numbness involving his left great toe. This patient sustained injuries on 15 June 1989 in a fall off of a 6' high scaffold. At that time the patient had a primary injury to his right heel with a comminuted fracture of the calcaneus with loss of the normal tuber angle. The patient subsequently had surgery with an open reduction internal fixation with elevation of the bone fragments and right iliac bone graft insertion of a Steinmann pin performed on 20 June 1989. The patient subsequently has done well under the care of Dr. Thomas. Starting on 13 September 1989 he was allowed to go to full weight bearing. The patient continued to have moderate pain in his subtalor joint area and subsequently was noted to have essentially a complete fusion involving the subtalor joint. The patient was initially thought to have had some entrapment of the peroneal tendons between the fibula and the os calcis. Contemplation of a possible surgical release was entertained. The patient however, seemed to have less tenderness and greater tolerance for being on his feet. He has been able to return to a work situation where there is light carpenter work required. He has had some tenderness in the area of the right great toe on the medial aspect with the development of a callus and previously had that trimmed on one occasion. The patient still takes Motrin medication from time to time. Dr. Thomas had previously felt that the patient had a 30% permanent partial impairment of his right lower extremity re-

lated to this injury. This is felt to be due to loss of the motion of the subtalor area and associated pain that the patient would have permanently with the possibility that he might later require a triple arthrodesis of the joint.

Upon examination today the patient has good dorsal flexion and plantar flexion movements of the right ankle. There is a well healed scar over the lateral aspect of the ankle, there is some tenderness deep to the area of the scar. It is felt to be only a toggle movement in the subtalor joint with inversion and eversion of the ankle basically a neutral position. X-rays that were taken show good maintenance of the tibial-talor joint. Subtalor joint is somewhat irregular. There is a normal tubor ankle. There is mild to moderate broadening of the calcaneus on the axial view. The patient is noted to walk in a normal toe heel manner. He does have a problem with a callus over the medial aspect of the great toe just distal to the IP joint of the great toe. This is tender to pressure.

SUMMARY: This 40 year old male is felt to have significant post traumatic arthritic changes involving the subtalor joint of his right ankle related to his original fracture of the calcaneus. While this patient has been able to get back to light work it is felt that he finds it extremely difficult to walk on irregular ground or to do the heavy work required normally of a carpenter. This patient is complaining of back symptomatology which he relates to his original injury. In view of the nature of his injury and the documentation of his symptoms at the time of injury it is felt that further evaluation of his back problem would be indicated if approved by the insurance company. We gave the patient a new prescription for Motrin and also sulfosalicylic acid plaster to apply to his right great toe for treatment of the soft tissue. We will see him back here in 3 to 4 weeks and if we are given permission for further evaluation of the back we will do that at that time. In respect to the degree of impairment that the patient has I feel that Dr. Thomas' evaluation of 30% of the right lower extremity is a reasonable evaluation.

DeLyle R. Youngman, M.D.

November 13, 1990:

This 40 year old male has been able to do light type of work with occasional lifting even up to 40 lbs. He complains of persistent discomfort in the lateral aspect of his right ankle. The patient is also complaining of intermittent low back discomfort aggrevated [sic] with activities with some pain going down the left lower extremity involving the left great toe. We have now been authorized to pursue an evaluation of his back symptomatology. Since the patient is doing reasonably well at the present time we are going to see him again in about 3 months concerning his right foot. He will continue to keep the callus over the medial aspect of the right great toe trimmed or use the 5% salicylic acid plasters.

DeLyle R. Youngman, M.D.

February 14, 1991:

This 40 year old male still has his chronic low back discomfort localized to the small of his back. The problems related to his ankle are directly related to the length of time that he is on his feet and his activity level. In view of his persistent back problem it is felt that we should pursue this by initiating an MRI study....

DeLyle R. Youngman, M.D.

March 5, 1991:

This 40 year old male did get an MRI and it shows a small posterior disc herniation at L5–S1 somewhat to the right of the midline. The patient does have right sciatic type pain. His range of motion of his back is about 80% of normal today. We are going to get this patient into a work hardening program and a work capacity evaluation....

DeLyle R. Youngman, M.D.

April 29, 1991:

[Appellant] has achieved a functional plateau in the Work Hardening Program. Based on a maximum effort functional testing Mr. Baccus is demonstrating functional capacity between the MEDIUM and MEDIUM–HEAVY Physical Demand Work Levels (Dictionary of Occupational Titles). He demonstrates an understanding and

consistent practice of appropriate body mechanics techniques. He appears to have achieved maximum benefit from Work Hardening at this time.

. . . .

Marc Bickford, PT

April 30, 1991:

This 40 year old male has completed his return to work program and work capacity. He has demonstrated his ability to function between a medium and medium heavy physical demand work level. It was explained to the patient that this means he can do frequent liftings up to 45 pounds. *Since the patient works as a carpenter and his normal job requires a much greater work capacity than this he will have to do some other form of work other than the regular carpentry work that he has been trained to do.* He will continue on his Motrin medication and we will recheck him back here in 6 weeks. We gave him a work release for limited type work effective 1 May 91. [Emphasis added.]

DeLyle R. Youngman, M.D.

June 11, 1991:

This 40 year old male hasn't been able to get regular employment as yet. He is doing his exercises regularly and takes Motrin medication on a regular basis. We are encouraging him to continue to seek regular employment and we will recheck him back here in 2 months.

DeLyle R. Youngman, M.D.

September 3, 1991:

DELYLE YOUNGMAN, M.D.

. . . .

DIAGNOSIS: (1) Lumbar herniated nucleus pulposus.

(2) Traumatic arthropathy of the joint.

The patient still is having moderate pain and swelling particularly on doing activities such as mowing the yard with his right ankle and to a lesser extent his back. This has kept him from being able to get gainful employment.

TREATMENT PLAN: The patient will continue on light to medium activities schedule to tolerance. He is to continue taking extra strength Tylenol and occa-sional Motrin. We would like to see him back here in 3 months and get x-ray of his right and [sic] ankle then.

November 5, 1991:

DELYLE YOUNGMAN, M.D.

. . . .

DIAGNOSIS: (1) Lumbar HNP

(2) Traumatic arthropathy, foot.

Mild swelling persists involving his right ankle. He has good ROM, no instability. X-rays taken show some narrowing of the subtaylor [sic] joint from the old fracture of the calcaneus. The patient's ROM of his lower back is 80% of normal.

January 6, 1992:

DELYLE YOUNGMAN, M.D.

DIAGNOSIS: (1) Lumbar HNP

(2) Traumatic arthropathy, foot.

The patient still has mild swelling involving his right ankle aggravated by being on his feet for long periods of time. There is only a trace of movement in the subtaylor [sic] joint.

This last notation followed Dr. Youngman's examination of appellant less than three weeks before trial. Clearly, as of January 6, 1992, appellant was incapacitated to some degree.

Appellee produced no evidence to refute appellant's disability resulted from the 1989 injury to appellant's foot. Appellee submitted evidence of a previous injury sustained by appellant in a 1984 car accident. However, this accident caused injuries to appellant's back and neck only. Testimony was elicited from appellant that he had brought suit against the vehicle owner, 7–Up Bottling Company, and he had claimed severe and disabling impairment and lost past and future earning capacity. Appellee's evidence concerning the auto accident included the following.

February 8, 1984:

Joseph H. Gaines, M.D.

. . . .

Patient was involved in an automobile accident. Hit from the side while he was driving on 1/9/84 by an RC truck. Says he apparently was not seen right then but has

been under the care of a physician. He has complaints of headaches, tingling in both hands, 3rd, 4th and 5th digits, and low back pain with a tightness and a dull type characteristic of pain. He says that the headaches were not related to being knocked unconscrious [sic] as such and I have explained to him that we do not treat headaches. He should seek help for this through his family physician. As far as the hands go, he seems to outline the ulnar distribution. Talks about the 5th finger and 4th finger but also the 3rd. This comes and goes, wakes him up at night and apparently is mainly tingling and not a significant pain or numbness and involves more the hands in a specific nerve root distribution coming from above but he does think that he has some forearm difficulty. The low back pain is something that is the mid-lumbar spine. He has no radiation and no evidence of any unusual dermatome pattern. Neurological exam is entirely intact.

X-rays demonstrate apparent retrolisthesis of L5 on S1 in the lumbar spine and demonstrates a rather significant degenerative joint disease at C5–6 on the cervical spine. Therapywise, we are going to start him in physical therapy for some isometric cervical exercises and intermittent cervical traction. We have put him on some Robaxin as a muscle relaxant and we will seehim [sic] back in 3–6 weeks in follow-up.

April 4, 1984:

[Joseph H. Gaines, M.D.]

Patient is seen in followup. He has improved. Seems to be helped by Therapy, therefore we will continue it. He demonstrates normal reflexes, normal motor exam today. Says his neck is greatly improved and he is not having much numbness down in the hand at all, and in fact none. He has intermittently had a shooting sensation in the right leg, but at present has none. Seems to get about and walk well.

X-rays of the lumbar spine do demonstrate that he appears to be forming a small traction spur at L5 which would be consistent with his injury. I suspect that this will stabilize. Surgery will not be re-

quired, and that he will do well over the next two months or so. He may do some work at this point, but should keep it light. We will see him back on PRN basis or in 2 months. He should continue Therapy as long as it seems to be helping, but discontinue it when he plateaus, clinically or symptomatically.

August 29, 1984:

[Joseph H. Gaines, M.D.]

Apparently seen by the emergency room physician with an acute episode with his back....

January 22, 1986:

Joseph H. Gaines, M.D.

....

Patient is seen in followup. He is still apparently having a little difficulty when he lifts things such as 80 pound pieces of sheetrock and doors which he has pretty well stopped lifting in the 200 pound range which is appropriate. He has tried to stay on his light jobs doing inside trim work which I think is probably appropriate.

His X-rays have not changed. His reflexes are symmetrical and intact. Straight leg raising test is negative and clinically he looks relatively good.

I have discussed the situation in general. He is two years post injury. I don't think any therapy or anything else is appropriate at this point. I think he has about gotten where he can go as far as conservative therapy. I have gone over with him as far as his pain and symptomatology I don't think he is having enough pain to justify an operative approach or even a myelogram and workup reference same. I think he concurs with this as I have gone over the surgery that would be contemplated, the risks and such. At present he is working. He is actually limiting himself very little as noted above and as such I think I would stop where we are....

July 10, 1986:

Comes in with more evidence of radiculopathy today and says he is not really improving any. Wishes to discuss the situation further in reference to the hand, upper extremity and such. Going over him I

do not see any specific abnormality, but due to the radicular pattern we have obtained an appointment for an EMG nerve conduction study on July 14, 1986. We will see him back following the same.

July 30, 1986:

Patient seen in followup following his EMG. The impression given us by the consultation, Dr. James A. Scott, is number 1: No distinct EMG evidence of radiculopathy, myopathy or entrapment neuropathy in areas sampled. Number 2 Clinically he noted that the patient had significant neck and shoulder stiffness and some discomfort and he thought that he would benefit from a home stretching program and they apparently discussed and worked those out for him, as far as instruction, and I think the patient is probably going to be able to do this on his own. Dr. Scott noted that it is possible that the patient may have such low grade intermittent nerve compression that is relatively infrequent, that he might have intermittent symptoms without causing any permanent type of nerve changes. He felt that were the symptoms to continue or worsen, that repeat testing may become of value to compare the tests at the base line study. Basically I have discussed the situation with the patient, and he thinks he probably can find some work that he doesn't have to do overhead and ceilings and he will continue to try to do work without this specific activity, as apparently he can get by without having difficulties doing things other than overhead work. We plan to see him in about 6–8 weeks and of course if he has any further difficulties, would consider repeating the nerve conduction studies, but at present I think we are at a point which he may return to light work and work within his capabilities and I dont [sic] think any operative intervention is probably indicated.

This evidence does nothing more than to establish that appellant suffered injuries to his neck and back from a 1984 auto accident. No expert testimony was offered by appellee to refute the severity of appellant's foot injury or the continuing disability from that injury.

■ After a careful examination of the record, we are of the opinion the jury's answers to the special issues are so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellant provided abundant medical evidence of the severity of his injury to his foot and back and his continued incapacity. This included the treating physician's qualified release prohibiting the lifting of objects weighing more than forty-five pounds. Appellant testified that this limitation caused more than thirty employers to decline to offer employment. He also testified that the inability to lift heavy objects and difficulty in climbing ladders so compromised his job performance as to preclude permanent employment when he was given the chance to work. Appellant testified he was only successful performing the tasks of a worker when another worker was available to carry his tools for him. Surely this opportunity was extraordinary and not likely to be replicated. The evidence presented to the jury showed the appellant is equipped to be a laborer and little else. Despite the evidence, the jury failed to find the appellant even partially incapacitated beyond May 1, 1991. Since we hold this to be against the great weight and preponderance of the evidence, we reverse and remand for a new trial.