

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-08-00008-CV
_____


RIGDON MARINE CORPORATION, Appellant

V.

BOBBY ROBERTS, JR., Appellee


On Appeal from the 273rd Judicial District Court
San Augustine County, Texas
Trial Court No. CV 06-8843


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

A melee which approached mutiny by an unruly crew on the coast of Angola, Africa, led to the brutal beating of Captain Bobby Roberts, Jr., the ship's master. Roberts brought suit against his employer, Rigdon Marine Company (Rigdon), owner of the *Iberville* ship, for Jones Act negligence and for failure to provide a seaworthy crew and vessel.[1] A jury awarded Roberts a total of $1,505,000, including $1,150,000 in lost future earning capacity. Rigdon appeals the jury's Jones Act negligence and unseaworthiness findings, as well as the lost earning capacity award, alleging both legal and factual insufficiency to support the verdict. Rigdon also challenges the trial court's denial of its request to submit proposed "foreseeability" and "savage disposition" jury instructions. We affirm the judgment of the trial court because we find the evidence sufficient to support the jury's verdict and the requested instructions to be potentially misleading embellishments to the well-established Fifth Circuit Pattern Jury Charges.

I.     **MUTINY ON THE *IBERVILLE***

Roberts was originally hired by Rigdon to work as master aboard the vessel *Bienville*, a sister ship of *Iberville*. The *Bienville* and *Iberville* were both stationed in Angola to supply the drilling rigs working in the offshore hydrocarbon fields of Angola; both vessels had crews comprised of a mix of Americans and Angolans. According to Rigdon personnel, the *Iberville*'s crew, including its then-captain, Jay Heater, had engaged in drug use while on board. Drinking and fighting, activities

---

[1]This case has been transferred to this Court as part of the Texas Supreme Court's docket equalization program.

2

proscribed by company policy, had been reported by Rigdon employees as having occurred aboard the *Iberville*. Rodney Abshire, Rigdon's marine superintendent in Angola and the overall supervisor of the crews of both the *Bienville* and the *Iberville*, asked Roberts to move from the *Bienville* to replace Heater due to the reported violations of Rigdon policy, an act done presumably in the hope that Roberts would be able to quell the prohibited conduct. In order to better ensure Roberts's safety in the task, Abshire promised to remove certain troublesome members of the crew from the ship.

This promise to ensure Roberts's safety was rendered meaningless when Roberts was brutally assaulted during his first day aboard the *Iberville*. When Roberts first boarded the deck, he encountered Heater, who maintained to Roberts that he (Heater) was to remain in charge and that Roberts was only to assume the duties of the relief captain; after this declaration, Heater suggested that Roberts place his belongings in the relief captain's quarters. Abshire, who arrived onboard the *Iberville* with Roberts, quickly corrected Heater by confirming Roberts was indeed "coming on as the lead." As problems presented themselves throughout the day, Heater would repeatedly ask Roberts when issues arose, "Do you want me to handle this as the captain or are you going to handle it as the captain?" Heater generally appeared irritated that Roberts was relieving him of his position as captain of the *Iberville*.

Three major events, all occurring within twenty-four hours, establish the unruliness of the *Iberville*'s crew. First, an American crew member who did not have permission to go into town, left the craft and returned intoxicated and had either sat or spat on a local Angolan. The Angolan

members of the crew took great umbrage at this display of disrespect toward their countryman, and a virtual riot broke out among them, during which they made the demand that the offending American crewman be immediately ejected from the ship. The immediate unrest appeared to have been assuaged by Roberts's assurance to the Angolans that the offending American crew member would be escorted off the vessel the following morning.

Roberts assumed that the tumult had fully subsided and continued to command the ship from the vessel's bridge. Heater stuck "his head in the side door" of the bridge and once again asked, "Are you going to handle this as the captain or am I?" Roberts, attempting to discern the problem to which Heater made reference, came to the door where Heater stood and was encountered by an unidentified Angolan assailant on the deck who rambunctiously proclaimed, "You're not the captain, you die; you die now." The assailant drew a knife and began to pummel Roberts with his fists. Roberts managed to escape the assailant and locked himself in the ship's "head" with Heater present on the bridge with Roberts. Shaken by the incident, Roberts called Abshire, related the occurrences and his current situation, and asked him to get to the ship as soon as possible. Roberts then secured the three doors to the bridge and called shore support for further assistance.

Irate Angolan crew members began to surround the secured doors shielding Roberts. Heater, disobeying a direct order from Roberts, opened a locked door, allowing angry Angolans to enter. Roberts testified that the Angolans hit him numerous times in the face, kicked him, and caused him to tumble down the stairs with four of the assailants atop him. At the foot of the stairs, they

4

continued thrashing Roberts so severely that "there was blood all over the walls." With the aid of another crew member, Roberts finally extricated himself from them and locked himself in another room. As a result of this beating, Roberts was bleeding, hurt everywhere, could not see in front of him at times, and experienced ringing in his ears. When Abshire arrived, Roberts asked to be taken to a doctor. Although Abshire testified that Roberts looked like he had been assaulted, was "banged around pretty good" (including a bloodied lip and red eye) and was in fear of his safety, Roberts claims that two days passed before a doctor was made available to him. As a result of these incidents, Roberts suffered numerous lasting injuries, including two slipped discs in his back, thoracic outlet syndrome, "concussive-type syndrome," post-traumatic type headaches, constant muscle tension, and chronic depression, anxiety, memory loss, and confusion.

## II. OVERVIEW OF APPLICABLE MARITIME LAW

### A. Jones Act Negligence

By enacting the Jones Act, Congress provided "a seaman injured in the course of employment" with a cause of action against an employer. 46 U.S.C. § 30104 (2008). To enlarge protection afforded to seamen under general maritime law, the Jones Act is liberally construed. *Boutte v. Cenac Towing, Inc.*, 346 F.Supp.2d 922 (S.D. Tex. 2004). In order to prevail on a Jones Act negligence claim against his employer, a seaman must establish: (1) personal injury in the course of his employment; (2) negligence by his employer or an officer, agent, or employee; and (3) causation to the extent that his employer's negligence was the cause "in whole or in part" of his

5

injury. *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 436 (4th Cir. 1999); *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997). Negligence under the Jones Act is interpreted broadly and is merely a failure to act as a prudent seaman under the circumstances. *Gautreaux*, 107 F.3d at 338. Liability for injuries sustained from Jones Act negligence may be based on two different, but not inconsistent, theories: the direct negligence theory and vicarious liability. E.L. Kellett, Annotation, *Liability Under Jones Act or Seaworthiness Doctrine for Injuries Caused by Assault*, 22 A.L.R.3d 624 (1968). To prove direct liability under the Jones Act in an assault case, the plaintiff must prove that the defendant either knew or should have known of the crew member's felonious and criminal propensities. *Birks v. United Fruit Co.*, 48 F.2d 656, 657 (D.C. N.Y. 1930). An employer may also be liable under the direct theory for other acts of direct negligence, such as allowing fights among the crew, failing to enforce rules prohibiting alcohol and drugs on board, or otherwise failing to provide for an employee's safety. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989) (fundamental duty of Jones Act employer is to provide seaman employees with reasonably safe place to work); *Stankiewicz v. United Fruit Steamship Corp.*, 229 F.2d 580, 582 (2nd Cir. 1956); *Jensen v. United States*, 184 F.2d 72, 74–75 (3rd Cir. 1950).

Recovery under the vicarious liability theory requires proof that the assailant was acting within the scope of his employment or in furtherance of his employer's business. *Miles v. Melrose*, 882 F.2d 976, 983–84 (5th Cir. 1989). The law is clear that an assault is not in furtherance of the master's business when it is committed by the crew upon the master. *Birks*, 48 F.2d 656. However,

6

in contrast to the direct liability theory, no proof is required to show that the assailant was of vicious or dangerous character or that the employer had reason to anticipate the assault. *Miles*, 882 F.2d at 983–84; 22 A.L.R.3d 624.

The causation burden for the claimant under the Jones Act is described as "featherweight." *Miles*, 882 F.2d at 983–84; *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). If proof justifies the conclusion that the employer's negligence "played any part, even the slightest, in producing the injury," the causation burden is met. *Gautreaux*, 107 F.3d at 335; *Ellis*, 971 S.W.2d at 406. This can be accomplished by "very little evidence." *Miles*, 882 F.2d at 984.

## B.  The Warranty of Seaworthiness

Maritime law also provides a cause of action for injuries resulting from defects or insufficiencies of a vessel, its crew, or its appurtenances that undermine the vessel's seaworthiness, render it unfit for its intended use, or make the vessel an unsafe place to work. *Rivera v. Herndon Marine Prods., Inc.*, 895 S.W.2d 430, 434 (Tex. App.—Corpus Christi 1995, writ denied). The warranty of seaworthiness is a species of liability without fault. *Boudoin v. Lykes Bros. Steamship Co.*, 348 U.S. 336, 337 (1955). An owner of a vessel is under an absolute, nondelegable duty to furnish a safe, seaworthy ship, complete with a competent crew. *Miles*, 882 F.2d at 981; *Wiradihardja v. Bermuda Star Line, Inc.*, 802 F.Supp. 989, 994 (S.D. N.Y. 1992). This duty is completely independent of an owner's duty under the Jones Act. Thus, to succeed on a claim for unseaworthiness, a plaintiff must only show that "the unseaworthy condition of the vessel was the

7

proximate or direct and substantial cause of the seaman's injuries." *Hernandez*, 187 F.3d at 439; *Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir. 1983). It is now settled that the employer's lack of knowledge of the assailant's character is no barrier to liability under the seaworthiness doctrine. *Boudoin*, 348 U.S. at 339–40; *Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 518 (2nd Cir. 1952). This proposition is in accord with the nature of the doctrine as a no-fault "warranty."

In his 1732 work, *Gnomologia*, English clergyman Dr. Thomas Fuller said, "He that will not sail till all dangers are over must never put to sea." Since sailors lead a rough life on the seas and are "more apt to use their fists than office employees," the no-fault warranty does not mean that a shipowner is liable for injuries "resulting from every sailors' brawl." *Boudoin*, 348 U.S. at 338–39; *Miles*, 882 F.2d at 981. In the case of an assault, liability turns on whether the assault was within the usual and customary standards of calling or whether it was committed by a seaman with a wicked disposition, a propensity for evil conduct, or a savage and vicious nature. *Boudoin*, 348 U.S. at 340. If the assaulting seaman has such a disposition, the ship is considered to be a perilous place. *Id.* An attack or threat with a dangerous or deadly weapon is sufficient to establish unseaworthiness. *Hildebrand v. S.S. Commander*, 247 F.Supp. 625, 627 (E.D. Va. 1965) (assailant third officer was incompetent crew member when he initiated unprovoked attack using threat of pocket knife, such that second officer's claim of unseaworthiness was sustained); 22 A.L.R.3d 624.

8

## III. PROPER DENIAL OF RIGDON'S PROPOSED JURY INSTRUCTIONS

### A. Standard of Review

An instruction is proper if it might assist the jury in answering the submitted questions, accurately states the law, and finds support in the pleadings and evidence. TEX. R. CIV. P. 277; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *Wal-Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex. App.—San Antonio 1998, pet. denied); *La. & Ark. Ry. Co. v. Blakely*, 773 S.W.2d 595, 598 (Tex. App.—Texarkana 1989, writ denied). A trial court is afforded more discretion when submitting instructions than when submitting questions. *Middleton*, 982 S.W.2d at 470. Since the trial court has considerable discretion to determine necessary and proper jury instructions, we review a trial court's decision to refuse a particular instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *Blakely*, 773 S.W.2d at 598. An abuse of discretion occurs where a trial court acts arbitrarily, unreasonably, without consideration of guiding principles, or clearly fails to analyze or apply the law correctly. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Middleton*, 982 S.W.2d at 469.

When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, we first determine if the instruction was reasonably necessary to enable the jury to render a proper verdict. *Shupe*, 192 S.W.3d at 579; *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000) (referring to TEX. R. CIV. P. 277, 278). The trial court

9

should refuse to submit an unnecessary instruction even if it correctly states the law. *Blakely*, 773 S.W.2d at 599. Well-settled pattern jury charges should not be embellished with addendum. *Weeks Marine, Inc. v. Salinas*, 225 S.W.3d 311, 319 (Tex. App.—San Antonio 2007, pet. dism'd).

The omission of an instruction is reversible error only if the complaining party establishes that the omission probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003). Any error in the omission of an instruction is harmless "when the findings of the jury in answer to other issues are sufficient to support the judgment." *Shupe*, 192 S.W.3d at 579–80 (citing *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980)).

B. **Procedural History Relating to the Charge**

At the charge conference, the trial court adopted Roberts's charge based on the Fifth Circuit Pattern Jury Charges. Rigdon objected to the charge because it did not instruct the jury on foreseeability or an assailant's savage disposition. Rigdon's proposed charge unsuccessfully requested the inclusion of the following instructions:

> A seaman's employer is legally responsible for the negligence of one of his employees while that employee is acting within the course and scope of his job. He is not, however, responsible for an assault unless it is foreseeable and the vessel's Master could have, but failed to, prevent the assault.

> Unfit crewmembers constitute just as much of a hazard as unfit gear: liability can arise if there is evidence that a particular crewmember had a propensity for violence. However, recovery is not allowed for every typical "sailors' brawl" or "fisticuffs."

10

Recovery from a shipowner, under the doctrine of unseaworthiness, for an assault by one of the ship's personnel upon another, may be had if there is proof that the assailant had such a savage disposition as to endanger the others who worked on the ship. A seaman meets this standard only if he has a wicked disposition, a propensity to evil conduct, or a savage and vicious nature.

The trial court denied Rigdon's request to include these instructions.

## C. Foreseeability Under the Jones Act

Rigdon argues that the trial court erred in failing to submit its instruction on foreseeability to the jury. Rigdon's argument is unsuccessful because the proposed instruction attempts to limit Roberts's theory of recovery, misstates the law, and is unnecessary. The instruction focuses specifically on the assault by the unknown seaman and the beating by local Angolans. The trial court could have determined that the instruction does not assist the jury because it does not address Roberts's direct liability theory—that Rigdon is liable for not ensuring his safety upon a vessel known to contain an unruly crew that failed to adhere to company policies against alcohol use, drug use, and fighting. Also, Rigdon's narrowly drafted proposed instruction begins by discussing the vicarious liability theory of recovery under the Jones Act. In the following sentence, the instruction states that Rigdon is not liable for an assault unless it is foreseeable. However, the law is clear that in contrast to the direct liability theory, no proof of foreseeablity is required under the vicarious liability theory. *Miles*, 882 F.2d at 983–84; 22 A.L.R.3d 624. Thus, the instruction misleads the jury and misstates the law.

The trial court utilized the Fifth Circuit Pattern Jury Charges, which set forth the elements of Jones Act negligence—(1) personal injury in the course of employment; (2) negligence by the employer or an officer, agent, or employee; and (3) causation to the extent that his employer's negligence was the cause "in whole or in part" of injury. *Hernandez*, 187 F.3d at 436; *Gautreaux*, 107 F.3d at 335. The requested embellishment by Rigdon was not necessary to render a proper verdict per *Gautreaux*. Since the pattern jury charges are well established, we cannot say that the trial court acted arbitrarily, unreasonably, or without consideration of guiding principles. *Walker*, 827 S.W.2d at 840.

### D. Savage Disposition Instruction Under Warranty of Seaworthiness

Rigdon's proposed instruction on savage disposition is a correct statement of the law. However, it again addresses only one theory of recovery under the warranty of seaworthiness. Proof of the breach of this warranty is a showing that an assailant had a savage disposition or that the assault was not ordinary. The proposed instruction omitted that an attack with a dangerous weapon is an unordinary attack that renders a ship unseaworthy. *Hildebrand*, 247 F.Supp. at 627;

12

22 A.L.R.3d 624.[2]  Due to this omission, it is possible that the trial court could have found this instruction as presented would be misleading to the jury.

In theory, the jury could feel compelled to render a verdict that the ship was seaworthy if savage disposition was not proved, even if Roberts proved that an unordinary attack occurred.  This would be an erroneous result.  As such, the trial court could have concluded that the instruction would not aid the jury.  Further, the instruction was unhelpful since it focused specifically on the assaults, yet did not address Roberts's theory that the vessel was unseaworthy because it contained an unruly crew and was generally not a safe workplace environment.

Even if the proposed instruction could have aided the jury, well-settled pattern jury charges should not be embellished with addenda.  *Salinas*, 225 S.W.3d at 319 (approving trial court's rejection of instruction on seaman status as embellishment since court used Fifth Circuit Pattern Jury Charges).  Again, because the trial court relied on the Fifth Circuit Pattern Jury Charges (which

---

[2]Instead, Rigdon attempts to show examples where vessels were found to be seaworthy even though deadly weapons were used during assaults.  In the following cases Rigdon cited, the courts concluded that the vessels were not unseaworthy because the plaintiff actually provoked the attack: *Connolly v. Farrell Lines, Inc.*, 268 F.2d 653 (1st Cir. 1959); *Jones v. Lykes Bros. Steamship Co.*, 204 F.2d 815 (2nd Cir. 1953); *Fountain v. John E. Graham & Sons*, 833 F.Supp. 873 (S.D. Ala. 1993); *Scurlock v. Wolfe*, No. 05-689, 2007 U.S. Dist. LEXIS 26801 (E.D. La. Apr. 11, 2006); *Gulledge v. United States*, 337 F.Supp. 1108 (D.C. Pa. 1972).

correctly stated the law on the warranty of seaworthiness) as its guide, this Court does not determine that the trial court acted arbitrarily, unreasonably, or without consideration of guiding principles. *See Walker*, 827 S.W.2d at 840.

Rigdon's first point of error is overruled.

## IV. THE EVIDENCE IS LEGALLY SUFFICIENT TO ESTABLISH JONES ACT NEGLIGENCE AND UNSEAWORTHINESS

### A. Federal Standard of Review Applies for Sufficiency Analysis

State courts have concurrent jurisdiction with federal courts to try in personam admiralty actions. 28 U.S.C. § 1333(1) (2008); *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 249 (1942). The United States Supreme Court has expressed its desire to have state courts uniformly apply the Jones Act and other admiralty law. *Garrett*, 317 U.S. at 244. Thus, when a state court hears an admiralty case, the court occupies the same position as a federal court sitting in diversity, and must apply substantive federal maritime law while following state procedure. *Ellis*, 971 S.W.2d at 406.

The United States Supreme Court's "uniformity requirement extends to the type of proof necessary for judgment." *Garrett*, 317 U.S. at 244. Similar to the burden of proof in the Jones Act, the standard of appellate review is less stringent than under the common law. *Ellis*, 971 S.W.2d at 406; *Salinas*, 225 S.W.3d at 322. Under this federal standard, the jury is vested with complete discretion on all issues of liability, prohibiting this Court from conducting the traditional factual sufficiency review. *Ellis*, 971 S.W.2d at 406. Instead, the verdict must be affirmed unless the evidence points "so strongly and overwhelmingly in favor of one party that the court believes that

14

reasonable men could not arrive at a contrary [conclusion]." *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 987 (5th Cir. 1989) (citing *Whatley v. Armstrong World Indus., Inc.*, 861 F.2d 837, 839 (5th Cir. 1988)).  In other words, once this Court determines that some evidence supports the verdict (even though it may be evidence about which reasonable minds could differ), the appellate review is complete.  *Ellis*, 971 S.W.2d at 406; *Miles*, 882 F.2d at 981 (holding evidence is sufficient to support finding of liability under Jones Act unless there is a "complete absence of probative facts").  Absent a finding that the verdict is "clearly wrong and unjust," it cannot be set aside.  *Ellis*, 971 S.W.2d at 407.  In so determining, this Court views all the evidence in the light most favorable to the jury's verdict.  *Jones*, 870 F.2d at 987; *see also Kansas City S. Ry. Co. v. Catanese*, 778 S.W.2d 114, 117 (Tex. Civ. App.—Texarkana 1989, writ denied).  Anything more than a scintilla of evidence is legally sufficient to support the finding.  *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 888 (Tex. App.—Texarkana 2004, pet. denied); *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 29 (Tex. App.—Tyler 2003, pet. denied).

The appropriate standard of review to test the sufficiency of the evidence in unseaworthiness claims tried before a jury determines whether there is a reasonable evidentiary basis for the jury's verdict.  *Loehr v. Offshore Logistics, Inc.*, 691 F.2d 758, 760 (5th Cir. 1982).  Where that evidentiary basis is present, the court's "function is exhausted."  *Id.*

**B.      Evidence Was Sufficient to Support Jury's Finding of Liability Under Jones Act**

Sufficient probative facts in this case suggest that reasonable minds could differ on the outcome of whether Rigdon was negligent under the Jones Act. *See Miles*, 882 F.2d at 981; *Ellis*, 971 S.W.2d at 406. Under the direct theory of liability, an employer can be liable under the Jones Act for allowing fights among the crew or in failing to enforce rules prohibiting alcohol and drugs on board. *Stankiewicz*, 229 F.2d at 582; *Jensen*, 184 F.2d at 74–75. Based on the testimony that a crew member left the ship and came back drunk, boarded the ship and was abusive to others, together with testimony that the crew engaged in drug abuse, alcohol use, and fighting, and that the very reason that Roberts was reassigned to *Iberville* from *Bienville* to quell such conduct in the future, the jury could conclude that the *Iberville*'s rules prohibiting these activities were not enforced. Thus, the jury could have found Rigdon negligent in failing to provide Roberts with a safe place to work or in failing to provide an adequate, competent crew.

By not removing unruly crew members (including Heater, after he proclaimed in Abshire's presence Roberts was not the captain), the jury could have found that Abshire, Roberts's superior, breached a fundamental duty of the Jones Act in failing to provide for Roberts's safety. *See Colburn*, 883 F.2d at 374. In delaying Roberts's medical treatment, even though he was in bad shape, the jury could have decided that Rigdon was imprudent. *See Premeaux v. Socony-Vacuum Oil Co.*, 144 Tex. 558, 192 S.W.2d 138, 143 (1946). Even focusing on the direct theory of liability for an assault, it is conceivable that the jury could have determined the assaults committed by an unruly, possibly

16

dangerous crew, were foreseeable to Rigdon since Abshire was required to replace Heater after reports of the crew's behavior, and, with the understanding that the crew was dangerous, promised to provide for Roberts's safety.

In sum, based on the evidence, which is viewed in a light most favorable to Roberts's position, the Court can conclude that the jury's verdict was not clearly unjust and wrong. *See Jones*, 870 F.2d at 987; *Ellis*, 971 S.W.2d at 407.

**C.** **Evidence Was Sufficient to Support Jury's Finding of Unseaworthiness**

For precisely the same reasoning set out in the previous section, the jury could have found that Rigdon breached its absolute, nondelegable duty to furnish a safe, seaworthy ship complete with a competent crew. *See Miles*, 882 F.2d at 981. Moreover, the jury could have determined that the assaults committed upon Roberts did not fall into the category of ordinary assaults or sailors' brawls, but were, rather, vicious and unprovoked attacks. *See Miles*, 822 F.2d at 981. The jury could determine that an attack with a knife, even though the knife was not actually employed as a weapon in the assault, amounted to an attack with a dangerous weapon. *Hildebrand*, 247 F.Supp. at 627; 22 A.L.R.3d 624. Thus, we can conclude that there was a reasonable evidentiary basis for the jury's verdict. *See Loehr*, 691 F.2d at 760.

Rigdon's second point of error is overruled.

17

**V.  THE EVIDENCE IS SUFFICIENT TO SUPPORT JURY'S LOST FUTURE EARNING CAPACITY AWARD**

Earning capacity is the ability and fitness to be employed in exchange for compensation including salary, commissions, and other benefits.  *Smoak*, 134 S.W.3d at 899 (citing *Baccus v. Am. States Ins. Co.*, 865 S.W.2d 587, 588 (Tex. App.—Fort Worth 1993, no writ)).  Proof of loss of earning capacity is always uncertain, must be judged on the particular facts of each case, and must be left largely to the discretion of the jury.  *Jones*, 870 F.2d at 989; *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710, 712–13 (1943); *Port Terminal R.R. Ass'n v. Sims*, 671 S.W.2d 575, 578 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).  Since it is well settled that minors who have never worked can suffer an injury that diminishes their future ability to work, recovery for loss of future earning capacity does not require a showing of lost earnings.  *McIver*, 169 S.W.2d at 712; *Smoak*, 134 S.W.3d at 903.  Factors such as stamina, efficiency, weakness, degenerative changes, and the ability to work even while experiencing pain, are legitimate considerations in determining whether a person has experienced an impairment in future earning capacity.  *Smoak*, 134 S.W.3d at 899; *Springer v. Baggs*, 500 S.W.2d 541, 544 (Tex. Civ. App.—Texarkana 1973, writ ref'd n.r.e.).  Thus, if Roberts demonstrated that pain or any other diminished ability prevented him from getting and holding a job, he was entitled to a lost future earning capacity award.  *See Reynolds*, 127 S.W.3d at 38.

The fact that Roberts earned as much as or more during trial than he did before his assault does not bar him from recovering lost earning capacity.  *See Jones*, 870 F.2d at 990.  While the

damages resulting from decreased earning capacity can best be shown by evidence of the amount that Roberts was capable of earning before he was injured compared to what he was capable of earning afterward, this type of proof is not required. *See Smoak*, 134 S.W.3d at 903; *Sims*, 671 S.W.2d at 578. Rather, the award can be based on a composite of all factors affecting the capacity of a person to earn. *Jones*, 870 F.2d at 989–90; *Reynolds*, 127 S.W.3d at 36. Thus, Roberts was not required to prove the exact amount of damages, but was only required to present facts from which the jury could in its sound discretion make a reasoned decision regarding the amount of the award. *See McIver*, 169 S.W.2d at 712–13; *Springer*, 500 S.W.2d at 545 (upholding jury's award of $16,000 lost earning capacity even though plaintiff went back to work after injury for same employer at same wage where testimony established plaintiff unable to work overtime, resulting in ten to twenty percent reduction in work over thirty-six-year life expectancy).

Here, trial testimony established that Roberts suffered chronic pain from two slipped discs in his back, thoracic outlet syndrome, post-traumatic type headaches, and constant muscle tension. Even Rigdon's doctor diagnosed Roberts with post "concussive-type syndrome." He also suffered from chronic depression, anxiety, memory loss, and confusion. Roberts testified that he was having trouble at work and experienced many headaches, ringing in his ears, exhaustion, panic attacks, had problems sleeping, and was emotionally upset. He also stated that his doctor preferred that he not work at all. His psychologist recommended that Roberts take a lesser position at work and expressed doubt as to whether Roberts would ever again be able to command the larger vessels. Nevertheless,

19

even though Roberts had difficulty passing the physical examination, he was employed by Hornbeck to work on smaller boats. This employment, however, was short-lived and Roberts was subsequently discharged by Hornbeck. At the time of trial, he had worked as needed on small boats for Brown Water Marine Company on a "time-on/time off" basis. Rigdon's attorney pointed out that because of his injuries, Roberts was endangering people's lives by working for Brown Water Marine Company. Based on this testimony, we conclude that Roberts demonstrated that pain or other diminished ability prevented him from obtaining and holding a job such that he was entitled to a lost future earning capacity award.

To justify the amount of the award, Roberts stated that work on the smaller Hornbeck boats paid $420 per day.[3] On these boats, he could work 243 days for an annual salary of approximately $102,000. Prior to his injuries, Roberts could work on larger crafts. The Hornbeck large boats paid a captain or master $615 per day for an approximate salary of $149,445.[4] Roberts is forty-seven years old and the closing argument suggested an additional thirty-three years of life expectancy. As an example of how the jury could reach its award, simply subtracting $102,000 from $149,445 gives an annual discrepancy of $47,445. Multiplied by thirty-three (Roberts's remaining life expectancy), the damages for lost earning capacity would equal $1,565,685. The jury may have further taken

---

[3]Roberts also testified that he made $110,000 annually working for Hornbeck while he was making $102,000 working at Rigdon. However, it is important to note that Roberts attempts to show that *if* he had not been injured, he *could* work the Hornbeck big vessels and make $149,445 per year.

[4]Roberts also noted that he was able to work only 180 days annually instead of the full 243 days per year.

Roberts's testimony that he can only work 180 days out of the year, multiplied that by $195 (the difference between $615 per diem pay for large boats and the $420 per diem pay for smaller boats), and again multiplied a rounded figure of $35,000 annual loss by thirty-three years to arrive at a loss of $1,155,000.  In sum, based on the numbers and figures presented at trial, we find support for the jury's $1,150,000 lost future earning capacity award.

## VI.    CONCLUSION

We affirm the judgment of the trial court because:  1) the refusal to submit Rigdon's proposed instructions was not in error, and 2) there was sufficient evidence presented to support the jury's findings regarding (a) Rigdon's liability under the Jones Act, (b) a breach of Rigdon's warranty of seaworthiness, and (c) the lost future earning capacity award of $1,150,000.


Bailey C. Moseley
Justice


Date Submitted:     September 10, 2008
Date Decided:       October 7, 2008

21