In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00033-CV


______________________________




ESTATE OF LELIA HOLLOWAY DAVIS, DECEASED


AND THE C. R. DAVIS TESTAMENTARY 

MARITAL TRUST AND THE CRLH DAVIS

TESTAMENTARY TRUST



 


On Appeal from the County Court at Law


Panola County, Texas


Trial Court No. 9,524




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 Upon review of the clerk's record in this appeal, we have considered whether the trial court's
partial summary judgment is a final and appealable probate order. Because we conclude that it is
not, we dismiss the appeal for want of jurisdiction.

I. FACTUAL AND PROCEDURAL BACKGROUND 

 A. Parties and the Wills

 Charles Russell Davis and Lelia Holloway Davis (husband and wife) (1) executed a joint and
mutual will in 1988 which was followed by a joint and mutual codicil to that will in 1993. The
Davises apparently had four children: Joyce Davis, Jeanne Davis Wylie, Nancy Davis Sargent, and
Charles Sterling Davis.

 In 1998, C. R. died and the 1988 will and its codicil were admitted to probate in the
administration of his estate. Among other things, a provision of the 1988 will created a marital trust
for the survivor; this trust was to be funded with $600,000.00 and the income from that trust was to
the benefit of the survivor for the survivor's life, with the remainder (on the death of the survivor)
to vest in Jeanne, Nancy, and Charles. Charles became trustee of this trust and was to be paid for
that service. Except for certain specific devises, the balance of the estate passed to the survivor. 
Upon the demise of the survivor, the residue of the trust and the remaining assets would pass along
in equal shares to Jeanne, Nancy, and Charles.

 In November 2005, just over a month before her death, Lelia executed a holographic will
which differed substantially from the joint and mutual will and codicil which she and C. R. had
executed. Charles proffered this holographic will and, on February 9, 2006, it was ordered admitted
to probate as Lelia's last will.

 Jeanne and Nancy filed an application to set aside the order admitting the holographic will,
claiming a lack of testamentary capacity and, alternatively, that undue influence had subverted Lelia's
capacity to make a will. By a separate pleading, they urged the probate of the 1988 will and its 1993
codicil as the last will and testament of Lelia.

 Jeanne and Nancy also filed an action in the Panola County district court which, among other
things, sought a determination that Charles had breached his fiduciary duty as trustee, claiming that
(1) because Lelia had elected to take under C. R.'s will, she had become irrevocably bound to its
terms and (2) the 1988 will and its 1993 codicil were contractual wills between C. R. and Lelia,
barring Lelia from changing the disposition which they made. 

 B. Consolidation and Competing Motions for Partial Summary Judgment

 The district court case was transferred to the County Court at Law of Panola County and was
subsequently consolidated with the will contest. On November 27, 2006, the trial court signed the
agreed order of consolidation which provided that the following causes be consolidated:

 (a) In Re: Estate of Lelia Holloway Davis, Deceased, Application to Probate
Joint and Mutual Will and Codicil and for Appointment of Co-Independent
Executrixes, Cause No. 9524, in the County Court of Panola County, Texas;


 (b) In Re: Estate of Lelia Holloway Davis, Deceased, Application to Set Aside
Order Probating Purported Will and Opposition and Contest to Such
Purported Will, Cause No. 9524, in the County Court of Panola County,
Texas;


 (c) In the Matter of The C. R. Davis Testamentary Marital Trust and The CRLH
Davis Irrevocable Testamentary Trust, Petitioners' Original Petition, in Cause
No. 2006-441, in the District Court of Panola County, Texas, 123rd Judicial
District. 


 Charles filed a motion for partial summary judgment, specifically challenging the claim of
Jeanne and Nancy that the 1988 will and 1993 codicil were contractual. That is, Charles moved for
summary judgment solely on the basis that the 1988 will and 1993 codicil failed to meet the
requirements for a contractual will (i.e., the will contained no provision stating that a contract
existed). See Tex. Prob. Code Ann. § 59A (Vernon Supp. 2006). Jeanne and Nancy responded
with their own motion for partial summary judgment, urging their contention that the 1988 will and
1993 codicil did meet Section 59A's requirements for a contractual will. 

 On February 20, 2007, the trial court granted Charles's motion and denied the motion of
Jeanne and Nancy, concluding that the 1988 will and its 1993 codicil are not contractual due to their
failure to comply with the requirements of Section 59A for contractual wills, that the earlier will and
codicil do not (on the theory that they are contractual wills) provide the basis for a constructive trust
of the property Lelia owned at her death, and that they were subject to revocation. In other words,
the order resolves one issue raised originally in Cause Number 2006-441. In doing so, the trial
court's order eliminates one avenue pursued in Jeanne's and Nancy's attempts to set aside the probate
of the holographic will and to have the 1988 will and its 1993 codicil admitted to probate. It does
not entirely eliminate any means of doing so, however, because the trial court has not disposed of
the allegations of the lack of testamentary capacity, the claim of undue influence having been
imposed in order to elicit the execution of the will, or of the claim of Jeanne and Nancy that Lelia
had some duties imposed on her because she had elected to take under the will of C. R.

 On this record, it appears that no action has been taken with regard to any of those theories
and, thus, they remain unresolved.

II. APPLICABLE LAW

 A. Determining Finality of the Order

 "Not every interlocutory order in a probate case is appealable . . . and determining whether
an otherwise interlocutory probate order is final enough to qualify for appeal, has proved difficult." 
De Ayala v. Mackie, 193 S.W.3d 575, 578 (Tex. 2006). To determine whether an order in a probate
matter is "final enough" under Section 5(g) of the Texas Probate Code and therefore appealable, the
Texas Supreme Court has adopted the following test:

 If there is an express [probate] statute, such as the one for complete heirship
judgment, declaring the phase of the probate proceedings to be final and appealable,
that statute controls. Otherwise, if there is a proceeding of which the order in
question may logically be considered a part, but one or more pleadings also part of
that proceeding raise issues or parties not disposed of, then the probate order is
interlocutory.


Crowson v. Wakeham, 897 S.W.2d 779, 783 (Tex. 1995); see Tex. Prob. Code Ann. § 5(g) (Vernon
Supp. 2006). Both parties agree that the first part of the Crowson test is not at issue; there is no
statute at issue that provides that this order is a final, appealable judgment. It is the second portion
of the Crowson test at issue here. So, we must consider whether the trial court's order granting
summary judgment is a part of a proceeding in which other pleadings have raised issues that were
left unresolved.

 It appears that the application of Crowson's language regarding a "proceeding" may be a
complicating factor. In arriving at its formulation of the test to be used, Crowson quoted with favor
Kelley v. Barnhill, 144 Tex. 14, 188 S.W.2d 385, 386 (1945):

 In order to authorize an appeal in a probate matter, it is not necessary that the
decision, order, decree, or judgment referred to therein be one which fully and finally
disposes of the entire probate proceeding. However, it must be one which finally
disposes of and is conclusive of the issue or controverted question for which that
particular part of the proceeding is brought.


Crowson, 897 S.W.2d at 781. Crowson itself utilized certain language from Estate of Wright, 676
S.W.2d 161 (Tex. App.--Corpus Christi 1984, writ ref'd n.r.e.), in pointing out that the order at issue
did not dispose of a "whole 'particular phase.'" Crowson, 897 S.W.2d at 782. The Texas Supreme
Court would later use similar language: "[U]nder Crowson, the trial court's order [denying a plea
to the jurisdiction and denying removal of executor] was interlocutory because it did not dispose of
all parties or issues in a particular phase of the proceedings"; the order "does not end a phase of the
proceedings, but sets the stage for the resolution of all proceedings." De Ayala, 193 S.W.3d at 579. 

 B. Cases on Which the Parties Rely

 Jeanne and Nancy point to Sanders v. Capitol Area Council, BSA, 930 S.W.2d 905, 909 (Tex.
App.--Austin 1996, no writ), to support their position that the partial summary judgment is a final
and appealable probate order. In Sanders, the Austin court examined an order entered in the
complex probate and trust litigation in terms of the Crowson test. Id. At issue in Sanders was who
(between the Boy Scouts Council and the decedent's daughter) was to receive a 5,000-acre ranch and
how it was to be received (by will or as secondary beneficiary of the trust). Id. at 907-08. The trial
court granted the Council's motion for summary judgment in part, concluding that the ranch reverted
to the decedent's estate because the decedent had exercised her power of appointment, through which
she had deleted her "legal heirs" on the trust document. (2)

 In their motion for rehearing after the Austin court reversed the trial court's judgment, the
Council asserted that the trial court's order granting partial summary judgment that characterized the
property was not appealable and that, accordingly, the Austin court lacked jurisdiction over Sanders's
appeal. The Austin court noted that the trial court ordered the case to proceed in certain steps:

 In the present case, the trial court ordered the case to proceed with the issues grouped
as follows: (1) the causes of action regarding the validity of the trusts and the will
contest shall be consolidated and tried first; (2) the causes of action seeking
declarations construing the trusts and the will shall be consolidated and tried next;
and (3) the claims for reimbursement and/or damages shall be consolidated and tried
only after the above issues have been determined.

Id. at 909. The Austin court observed that the partial summary judgment that characterized the
property appeared to have completed a phase of the probate proceedings, "either the first or second
(or both) of the trial court's three groupings." Id. The Sanders court stated its interpretation of
Crowson:

 We do not read Crowson as eliminating the idea that a probate matter can proceed
in discrete "phases"; rather, we believe the court's holding to be simply that a phase
must generally be completed before an appeal may be taken.

Id. Perhaps recognizing how difficult determining the Crowson question can be, however, the
Austin court avoided making a specific holding on the issue of whether the partial summary
judgment was an appealable probate order. Instead, the court decided that it did have jurisdiction
based on the rules regarding a prematurely-filed appeal and treated the appeal as one from the
subsequent order admitting the will to probate. Id. at 909-10. So, Sanders actually concludes that
the court had jurisdiction on an entirely different basis.

 Here, as in Sanders, there is a consolidation order. However, while the Sanders
consolidation order specifically delineated the sequence in which the litigation would thereafter
proceed, the consolidation order here simply identifies the issues to be addressed in the consolidated
action. We also note that the Sanders consolidation order divided the litigation into rather broad
stages; it did not parcel out specific issues. Therefore, to the extent that Sanders can be read to stand
for the proposition that a trial court consolidation order can aid in determining whether an order is
final and appealable, we distinguish the instant case from the facts in Sanders. (3) 

 Charles relies on In re Estate of Willett, 211 S.W.3d 364, 367 (Tex. App.--San Antonio
2006, no pet.), to support his position that the partial summary judgment is interlocutory and,
therefore, not ripe for appeal. In Willett, the parties' litigation stemmed from the widow's act of
having changed her will shortly after she took under her husband's will, that will including language
depicting an agreement to make mutual wills and that upon the death of the survivor, their seven
children would receive all of the property. After the husband died, the wife probated the will and
elected to take under it. Despite this election, less than one month later, the wife executed a new
will, leaving her entire estate to only one daughter. Id. at 365-66. After the wife died, the
daughter/sole beneficiary probated the new will and took under the terms of that will. Id. at 366. 
The beneficiaries who were named in the husband's will (and the wife's old will) sued the daughter
for breach of contract, promissory estoppel, breach of fiduciary duty, forfeiture of inheritance,
conspiracy, and conversion, and sought a declaratory judgment, an accounting, a constructive trust,
and actual and exemplary damages. Id.

 The trial court granted the would-be beneficiaries' motion for summary judgment in part,
concluding that the husband's will was probated as an "election will," that the wife was bound by its
terms to leave specified portions of the estate to named beneficiaries, and that the interest of the
estate designated to pass to the daughter who took as sole beneficiary under the purported new will
would be suspended during the remainder of the trial. Id. The trial court also ordered that trial on
the remaining causes of action, specifically forfeiture of the daughter's inheritance over and above
what she would receive had the original will been in effect, damages, attorney's fees, and
constructive trusts, be set.

 The San Antonio court concluded that the trial court's order was not a final, appealable order:

 Plainly, the appellees' petition raises issues not disposed of by the trial court's order. 
By its very terms, the partial summary judgment order does not dispose of the issue
of whether [the daughter] is entitled to possession of her one-fourth interest in [the
father's] estate; rather, the order expressly provides that this interest "shall remain in
suspense pending trial in this cause." Cf. In re Estate of Padilla, 103 S.W.3d 563,
566 (Tex. App.--San Antonio 2003, no pet.) (mem. op.). The partial summary
judgment order also does not dispose of the appellees' remaining causes of action;
rather, the order expressly orders these causes of action set for trial. Nor is there an
order severing the trial court's partial summary judgment, as there was in Crowson. 

Id. at 367. The court then dismissed the case for want of jurisdiction.

III. ANALYSIS

 We first note that the effect of the trial court's order in Willett has the opposite of the effect
of the order at issue here. That is, in Willett, the effect of the order was that the wife was to be bound
to the terms of the mutual wills. In Willett, unlike here, the trial court also made specific rulings as
to certain issues, specifically designating that remaining "causes of action" would be set for trial. 
Nonetheless, we see the order at issue here more akin, in terms of finality, to the order examined in
Willett. Here, the trial court found that Lelia had not been bound by the terms of the 1988 mutual
will and its codicil on the basis that it was a contractual will and that the issue of contractual will
would not be a bar to revocation, the practical effect being that the 2005 will is still in effect unless
Jeanne and Nancy successfully challenge it on the basis of undue influence and lack of testamentary
capacity. The summary judgment also did not deal with the issue of whether Lelia was bound to
certain terms of C. R.'s will because she had elected to take under it.

 It is this condition on which we focus. To apply either part of the Crowson test, we must first
identify the phase of the probate proceeding at issue. See id. We look at this litigation as one
involving at least two phases: (1) which will controls the distribution of the estate, and (2) under the
governing will, what is the proper funding and management of the testamentary trusts. We see the
application by Jeanne and Nancy to set aside the probate of the 2005 holographic will, the
application for the probate of the 1988 will and its codicil, and the determination of any rules which
may apply should it be determined that there are consequences to her having made an election to take
under C. R.'s will as one relevant distinct phase of the proceeding at issue here, at the end of which
the trial court will have decided which will governs the distribution of the estate.

 The order here resolves only one issue in this larger phase of the proceeding and, thus, leaves
issues raised in that phase unresolved as did the order in Willett. The trial court's order, then,
disposes of only one of the issues raised in the first phase. That one issue is the contractual will
issue. However, it leaves open the issues concerning the lack of testamentary intent and undue
influence as they impact the validity of the 2005 holographic will and the issue of the election by
Lelia to take under C. R.'s will. (4) Put another way, the trial court's order concludes that the 1988 will
and its 1993 codicil were not contractual and that the issue of contractual wills is not a bar to
revocation by her; it does not conclude whether the 2005 holographic will was effective in revoking
the 1988 will and its 1993 codicil and does not deal with the issue of election. That said, the trial
court's order does not fully address the issues raised in the first distinct phase of the proceeding. (5) 
It does not finally conclude which will controls the distribution of the estate. The order is, therefore,
interlocutory in nature and not final and appealable.

 Accordingly, we dismiss the appeal for want of jurisdiction.




 Bailey C. Moseley

 Justice


Date Submitted: September 11, 2007

Date Decided: September 12, 2007


1. References to Mr. Davis will be as "C. R." and references to Mrs. Davis will be as "Lelia." 
After their initial listing, references to their children will be by their first names only. Although
some of the children's families are also involved in the devises and in the litigation, each child's
family has assumed the same position of these children with whom they are associated and are not
mentioned in this opinion by name.
2. This precise basis for summary judgment was not advanced in the Council's motion for
summary judgment, a situation which led the court to reverse the trial court's order and remand the
case. Sanders, 930 S.W.2d at 911. The case would come back to the Austin court in 1998. See
Sanders v. BSA, No. 03-97-00345-CV, 1998 Tex. App. LEXIS 6354 (Tex. App.--Austin Oct. 15,
1998, pet. denied) (not designated for publication).
3. We again note that the Sanders opinion does not decide the jurisdictional issue on the basis
that the order granting partial summary judgment was final. In fact, the Sanders court instead
"assume[d] without deciding that the partial summary judgment . . . was not, itself, an appealable
order" and went on to decide the issue by relying on rules regarding prematurely-filed notices of
appeal. See Sanders, 930 S.W.2d at 910.
4. Of course, the trial court's summary judgment does not directly address the matters originally
raised in Cause Number 2006-441 regarding the allegations involving the trusts. However, the trial
court's conclusion that the 1988 will and its 1993 codicil were not contractual and were subject to
revocation on that theory does indirectly affect the allegations in the trust matter. Many of the issues
raised in the trust litigation appear to be intimately linked to whether the 1988 will and its 1993
codicil are admitted to probate. Nevertheless, the order does not dispose of any claim related to the
trust litigation. We are less concerned that the trust issues remain unresolved than we are that the
other will issues remain. More important to our analysis is the fact that the other will issues remain
unresolved since those issues still leave open the possibility that the trial court could determine that
the 2005 holographic will should not have been admitted to probate.
5. The Texas Supreme Court has reiterated that litigants can and should seek a severance order
to ensure efficient review of orders in probate proceedings: "Recognizing the inherent difficulties
in applying any test to determine appealability, we urged parties to seek severance orders to eliminate
ambiguities about whether the order was intended to be final and appealable." De Ayala, 193
S.W.3d at 578 (citing Crowson, 897 S.W.2d at 783).


Tex. R. App. P. 33.1(a). Pilgrim's Pride filed a motion to exclude Penny's
testimony, but a ruling on that motion does not appear in the record. 
          Pilgrim's Pride did object at trial to Penny's testimony on several grounds, none of
which were based on his qualifications for which they received an adverse ruling. Pilgrim's
Pride objected to any reference in Penny's testimony that Link received a traffic citation. 
Pilgrim's Pride also objected at various times to the accident report prepared by Penny. 
They objected to any reference to a citation or to insurance in that report. The trial court
sustained this objection and ordered those references redacted from the report. Counsel
began, but did not pursue, an objection to the accident report, "subject to our prior
objection regarding Officer Penny's qualifications to render the opinions regarding what
caused the accident . . . ." Link later "opened the door" during his testimony concerning
the citation he received. Smoak then offered unredacted versions of Penny's report. 
Pilgrim's Pride objected, "just the same objection that we have had before on these
documents, . . . ." The court left out any references to insurance in the report, but allowed
the references to the citation. Pilgrim's Pride failed to object and obtain an adverse ruling
that Penny was not qualified to testify concerning negligence.



 
          2. No Evidence
          Pilgrim's Pride contends, nonetheless, that, because Penny was not qualified to give
his opinion on whose negligence caused the accident, his conclusion that Link was the
negligent party was no evidence to support a verdict and that, because it was no evidence,
no objection was required. 
          Incompetent opinion testimony is not evidence, and a finding supported only by such
testimony cannot survive a no-evidence challenge. Leitch, 935 S.W.2d at 119; Mo. Pac.
R.R. Co. v. Buenrostro, 853 S.W.2d 66, 77 (Tex. App.—San Antonio 1993, writ denied)
(finding testimony of conclusion that defendant had right to control plaintiff and thus had
obligation to exercise care in his safety was no evidence, even though not objected to,
because offered by unqualified witness); Gannett Outdoor Co. v. Kubeczka, 710 S.W.2d
79, 89 (Tex. App.—Houston [14th Dist.] 1986, no writ). 
 
 
          Texas Rule of Evidence 702 generally governs expert testimony:
          If scientific, technical, or other specialized knowledge will assist the
trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of an opinion or otherwise.
 
Tex. R. Evid. 702.
          Smoak, who concedes Penny was not an expert on accident reconstruction,
contends his testimony was evidence on negligence because it was lay opinion based on
his own personal observations and experiences as a police officer. Smoak cites Williams
v. State, 760 S.W.2d 292 (Tex. App.—Texarkana 1988, pet. ref'd), and Carter v. Steere
Tank Lines, Inc., 835 S.W.2d 176 (Tex. App.—Amarillo 1992, writ denied). In Williams,
760 S.W.2d at 296, an officer testified to the common use of vise grips to assist in stealing
cars. The court found his testimony was based on his personal observations and
experiences as a police officer. Id. In Carter, 835 S.W.2d at 182, an officer attempted to
testify on the proper method for turning left. The court found the officer's testimony was
not testimony on scientific, technical, or other specialized knowledge, and the testimony
could be given by a lay witness. Id. In this case, Penny based his opinion on witness
testimony and physical evidence, such as skid marks and vehicle damage. He was not
asked a general question on the proper method of changing lanes, but a specific question
on whether Link's lane change was a cause of the accident. Such testimony on accident
causation is required to be given by a qualified person in that science. Gainsco County
Mut. Ins. Co. v. Martinez, 27 S.W.3d 97, 105 (Tex. App.—San Antonio 2000, pet. dism'd
by agr.); Chavers v. State, 991 S.W.2d 457, 460–61 (Tex. App.—Houston [1st Dist.] 1999,
pet. ref'd); Trailways, Inc. v. Clark, 794 S.W.2d 479, 483 (Tex. App.—Corpus Christi 1990,
writ denied).
          As a general rule, police officers, based on their position as police officers alone,
are not qualified to render opinions regarding accidents. Lopez v. S. Pac. Transp. Co., 847
S.W.2d 330, 334 (Tex. App.—El Paso 1993, no writ). However, police officers are qualified
to testify regarding accident reconstruction if they are trained in the science and possess
the high degree of knowledge sufficient to qualify as an expert. Martinez, 27 S.W.3d at
104–05; Chavers, 991 S.W.2d at 460–61; Trailways, Inc., 794 S.W.2d at 483.
          No definite guidelines exist for determining whether a particular witness possesses
the knowledge, skill, or expertise to qualify as an expert. Rogers v. Gonzales, 654 S.W.2d
509, 513 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.). Caselaw exists on both sides
of this issue. See, e.g., Trailways, Inc., 794 S.W.2d at 483 (officer allowed to testify
regarding speed of bus and its contribution to cause of accident); Rainbo Baking Co. v.
Stafford, 764 S.W.2d 379, 383 (Tex. App.—Beaumont 1989), writ denied, 787 S.W.2d 41
(Tex. 1990) (officer permitted to testify regarding cause of accident); DeLeon v. Louder,
743 S.W.2d 357, 359 (Tex. App.—Amarillo 1987), writ denied, 754 S.W.2d 148 (Tex.
1988) (officer held to be qualified to testify regarding cause of accident); Rogers, 654
S.W.2d at 513–14 (officer qualified to testify regarding speed based on skid marks). But
see, e.g., Lopez, 847 S.W.2d at 335 (officer not qualified to testify regarding cause of
accident where there was no showing of specialized knowledge in accident reconstruction);
St. Louis Southwestern Ry. Co. v. King, 817 S.W.2d 760, 763 (Tex. App.—Texarkana
1991, no writ) (court did not abuse its discretion in excluding officer's testimony regarding
cause of accident); Hooper v. Torres, 790 S.W.2d 757, 760–61 (Tex. App.—El Paso 1990,
writ denied) (officer not qualified to testify as to cause of accident because he was not
accident reconstructionist); Bounds v. Scurlock Oil Co., 730 S.W.2d 68, 71 (Tex.
App.—Corpus Christi 1987, writ ref'd n.r.e.) (officer not qualified to express opinion on
cause of accident where he was not accident analyst or reconstruction expert). 
          In this case, Penny testified he was not qualified to give an expert opinion on
accident reconstruction. He testified he had been a patrolman with the Daingerfield Police
Department for one and one-half years. In his deposition testimony attached to Pilgrim's
Pride's motion to exclude, he testified he graduated from Northeast Texas Community
College Academy with a degree in applied science, not criminal justice. He took only one
class on accident reconstruction, which was a one-week course for three hours a day. He
received no other accident reconstruction training. He did not testify regarding the number
of accidents he had investigated, but he stated he had worked fewer than ten accidents
which involved the Watson-Broadnax intersection. See Clark v. Cotten, 573 S.W.2d 886,
887–88 (Tex. Civ. App.—Beaumont 1978, writ ref'd n.r.e.) (officer with eight and one-half
years' experience and who had investigated over 350 accidents insufficient to qualify as
expert when he had no specialized training in accident reconstruction). 
          Penny was not an accident reconstruction expert who had the experience and
knowledge to observe the scene and add some scientific, technical, or specialized
knowledge to the evidence which would assist the trier of fact to understand the evidence
and testimony in the case. Penny, therefore, was not qualified to offer his opinion on
whose negligence caused the accident, and his conclusion on who caused the accident
did not assist the jury.


 
          3. Expert Testimony Not Required
          Penny's opinion on causation was not based on any scientific, technical, or other
specialized knowledge not generally possessed by a layperson. Tex. R. Evid. 702 permits
the testimony of an expert if "scientific, technical, or other specialized knowledge will assist
the trier of fact to understand the evidence or to determine a fact in issue, . . . ." Penny's
opinion as to the cause of the accident was not based solely on his direct observations of
the accident scene, but also on his interviews of witnesses after the fact. His opinion that
Link caused the accident by being inattentive and by unsafely changing lanes did not
involve any specialized accident reconstruction expertise, but rather was based on Penny's
interviews at the scene and from his observation that the skid marks began in Smoak's
merge lane. The jury had the direct testimony of the witnesses to the accident, as well as
photographs and diagrams of the scene, and was in as good a position as the officer to
form an opinion as to the cause of the occurrence. See Monsanto Co. v. Johnson, 675
S.W.2d 305, 311 (Tex. App.—Houston [1st Dist.] 1984), pets. ref'd [2 pets.], 696 S.W.2d
558 (Tex. 1985) (officer not allowed to testify accident caused by driver's seizure or
blackout because he was not specially qualified to give such opinion by any knowledge that
was not generally possessed by layperson); see also McMichen v. Moattar, 470 S.E.2d
800, 801–02 (Ga. Ct. App. 1996); Breagy v. Stark, 642 A.2d 329, 333 (N.H. 1994) (finding
officer's testimony on allocation of fault properly excluded because would not have assisted
jury where jury had already heard from numerous fact witnesses, seen photographs, and
heard officer's testimony about his observations); Hatfield v. Andermatt, 561 N.E.2d 1023,
1025–26 (Ohio. Ct. App. 1988).
          In this case, the determination of whose negligence caused the accident did not
require the testimony of an expert. Expert testimony is necessary when the alleged
negligence is of such a nature as not to be within the experience of the layperson. Roark
v. Allen, 633 S.W.2d 804, 809 (Tex. 1982). Expert testimony is generally necessary in
medical malpractice cases and chemical exposure cases, in which medically complex
diseases and causal ambiguities compound the need for expert testimony. LeNotre v.
Cohen, 979 S.W.2d 723, 727–28 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); see
also Hernandez v. Tex. Employers Ins. Ass'n, 783 S.W.2d 250, 252–53 (Tex.
App.—Corpus Christi 1989, no writ) (holding that expert testimony needed to determine
cause of asthma, which had uncertain causal nature). Other claims also require expert
testimony to assist the trier of fact. See Turbines, Inc. v. Dardis, 1 S.W.3d 726, 738 (Tex.
App.—Amarillo 1999, pet. denied) (concluding negligence of aircraft turbine engine
mechanic requires expert testimony because "performance of mechanical work on turbine
aircraft engines is not within the experience of a layman"); Hager v. Romines, 913 S.W.2d
733, 734–35 (Tex. App.—Fort Worth 1995, no writ) (concluding aerial application of
herbicide must be established by expert testimony because "[n]ot only is flying an airplane
not within the realm of experience of the ordinary, prudent person or juror, . . . applying
herbicide and pesticide aerially requires use of specialized equipment and techniques that
are not familiar to the ordinary person"). 
          Pilgrim's Pride does not contend that there was insufficient evidence to establish
that the accident caused Smoak's back injury and resulting surgery, only that there was no
or insufficient evidence of whose negligence caused the accident. However, not every
motor vehicle accident requires expert testimony to understand how it took place and who
was at fault. This case does not involve complex accident reconstruction analysis in order
to understand whose negligence caused the accident, and the jury had ample evidence
from which to determine fault. This case involved a low-speed collision between two
vehicles. Several fact witnesses testified regarding the circumstances that caused the
accident, and the physical evidence in the form of skid marks and damage to the vehicles
was not outside a layperson's common sense or understanding. This was not a case with
an unknown origin or circumstances. 
          The parties were permitted to introduce qualified accident reconstruction experts to
assist the jury in determining the cause of the accident, but they were not required to do
so. The trier of fact is usually allowed to decide the issue of causation in cases when
general experience and common sense will enable a layperson to fairly determine the
causal relationship between the event and the condition. Lenger, 455 S.W.2d at 706. The
question here was not a complex one and was not beyond the competence of the average
juror. Therefore, expert testimony was not required to establish negligence.
          There was legally and factually sufficient evidence to support the jury's verdict that
Pilgrim's Pride and Link were seventy-five percent at fault for the accident. Penny's
conclusion that Link's negligence caused the accident was no evidence, but his testimony
concerning his observations during the investigation were admissible. Testimony by a lay
witness is admissible if it is "(a) rationally based on the perception of the witness and (b)
helpful to a clear understanding of the witness' testimony or the determination of a fact in
issue." Tex. R. Evid. 701. Penny testified regarding several observations he made during
his investigation which were helpful to a clear understanding of who caused the accident. 
He testified the skid marks started in Smoak's merge lane. He also testified regarding the
location of the two vehicles and the damage to each. He stated the front left of Smoak's
vehicle was severely damaged and was stuck to the back tandem wheels of the eighteen-wheeler. Penny also testified regarding the weather conditions at the time of the collision,
the configuration of the Watson-Broadnax intersection, and the lack of a yield sign in
Smoak's merge lane onto Broadnax. All these observations were admissible as rationally
based on Penny's perception and were helpful to the determination of who caused the
accident. 
          In addition, Smoak testified that the eighteen-wheeler was in the intersection when
he began to merge onto Broadnax and that, as he proceeded in the merge lane, he was
struck immediately after he passed the concrete median. He testified that he was struck
in his lane and that Link had to cross a double white stripe to hit him at that point. Link
admitted the wreck could have been his fault and volunteered that the police officer had
issued him a traffic citation. He testified that, when he entered the intersection, he looked
to the right, but did not see anyone coming. He testified he started to proceed into the right
merge lane of Broadnax to get out of the way of faster traffic, and that is when the impact
occurred. He testified he never saw Smoak until after the accident. 
          The evidence Link was not negligent includes the testimony of Bolton. It is unclear
from her testimony exactly where she was located when she observed the accident, but
she testified Smoak passed her and tried to get to the right of the eighteen-wheeler, but
collided with its back end. This testimony suggests that Smoak's inattention contributed
to the accident, and the jury did in fact determine that Smoak was twenty-five percent at
fault. 
          We do not pass on the credibility of the witnesses, and we do not substitute our
opinion for the trier of fact, even if there is conflicting evidence on which a different
conclusion could be supported. Clancy, 705 S.W.2d at 826. There is evidence Link
negligently caused the accident, and the verdict is not so against the great weight and
preponderance of the evidence as to be manifestly unjust.
 
III. EQUAL INFERENCE RULE
          Pilgrim's Pride also attacks the jury's findings on the basis that the conflicting
inferences that may be drawn from the circumstantial evidence in this case are equally
probative of different occurrences. Pilgrim's Pride contends that, in such a situation, the
equal inference rule requires that all inferences be disregarded. This is a
mischaracterization of the equal inference rule. That rule applies only where the
circumstantial evidence supporting the inferences is so slight that any plausible inference
is only a guess, and thus amounts to no evidence at all. If circumstantial evidence will
support more than one reasonable inference, as in this case, it is for the trier of fact to
decide which is more reasonable, subject only to a factual sufficiency review. See Morton
Int'l v. Gillespie, 39 S.W.3d 651, 658 (Tex. App.—Texarkana 2001, pet. denied); Purina
Mills, Inc. v. Odell, 948 S.W.2d 927, 936 (Tex. App.—Texarkana 1997, writ denied)
("Disputed facts may be established by circumstantial or direct evidence. Absolute
certainty is not required. Nor must the plaintiff exclude every other possibility. All that is
required before there can be a finding of ultimate fact is proof of a causal connection
beyond the point of conjecture or mere possibility." (Citations omitted.)). It was for the jury
in this case to decide which inference was more reasonable, and its verdict was not so
against the great weight and preponderance of the evidence as to be manifestly unjust.
 
 
IV. ECONOMIC EXPERT'S TESTIMONY
          Pilgrim's Pride contends that Dale Funderburk, Smoak's economic expert, was not
a qualified vocational expert or employment specialist and that his methodology was
flawed. Therefore, according to Pilgrim's Pride, the trial court abused its discretion in
permitting him to testify and his testimony was no evidence on past or future lost earnings. 
Pilgrim's Pride also contends Funderburk's testimony was improperly allowed after he
materially changed his opinion and deviated from his own methodology and assumptions
the day before trial, without giving the proper thirty-day pretrial disclosure. 
          Funderburk testified to the loss of earning capacity Smoak suffered as a result of
a back injury he sustained in the accident. He testified he arrived at loss of earning
capacity by comparing two streams of income. He compared what a person will be able
to earn, given such person's injuries, to what that person would have been able to earn
over his or her work life had such person not been injured. He stated that earning capacity
at the time of injury is usually what a person is earning at the time of injury. In cases such
as Smoak's, his actual earnings at the time of the accident did not represent his earning
capacity because he was involved in starting agricultural endeavors, such as timber, hay
baling, farming, and cattle raising. Funderburk testified these endeavors produced a low
and erratic stream of income, but there were times before the accident when Smoak
worked as a welder. Smoak indicated to Funderburk that, after the accident, he made
$17.00/hour as a welder. Funderburk looked at the $17.00/hour figure and compared it
with figures put out by the U.S. Department of Labor. He determined construction workers
made that much or more. Funderburk then used that $17.00/hour welding job, annualized
to $35,000.00/year as Smoak's earning capacity at the time of the accident. He used the
$17.00/hour welding job as the basis of Smoak's earning capacity because Smoak had the
ability and option to perform that work before the accident. 
          Smoak indicated to Funderburk that, after the accident, he was no longer physically
able to work as a welder. So, in his preliminary report, Funderburk used zero as Smoak's
residual ability to work after the accident. After the preliminary report, but before trial,
Smoak indicated to Funderburk he was able to work, with the assistance of helpers, in the
agricultural ventures. Funderburk then determined Smoak could earn between
$12,000.00–$25,0000.00/year in those ventures. 
          Funderburk took those two incomes, calculated a stream of earning capacity to the
expected work-life expectancy for each, compounded those incomes, and discounted them
to present value. He subtracted Smoak's income stream, had he not been injured, to his
projected income with the limitations from the injury. He used two possible work-life
expectancies and gave both figures to the jury. He determined that, if Smoak worked to
age 60.2, the loss of future earnings after the accident would be $254,000.00, based on
earnings of $25,000.00/year in his agricultural ventures. He calculated Smoak's future
earnings would be $572,720.00, based on earnings of $12,000.00/year post-accident. 
Funderburk determined that, if Smoak worked to age 67, the loss of future earnings would
be $312,704.00, based on earnings of $25,000.00/year post-accident, and $705,094.00,
based on earnings of $12,000.00 post-accident. The jury found $200,000.00 as the loss
of future earning capacity. 
          1. Preservation of Error 
          Pilgrim's Pride did not preserve error in their objection that Funderburk was
unqualified or relied on unsound methodology. Pilgrim's Pride filed a motion before trial
to exclude Funderburk's testimony. However, Pilgrim's Pride was required to obtain an
adverse ruling on their objection to preserve error for review. See Tex. R. App. P.
33.1(a)(2); Kerr-McGee Corp. v. Helton, No. 02-0356, 2004 WL 224458, at *5 (Tex.
Jan. 30, 2004) (finding that trial court's ruling on motion to strike expert's testimony after
cross-examination was sufficient to preserve the parties' no-evidence complaint); GTE
Mobilnet of S. Tex. Ltd. P'ship v. Pascouet, 61 S.W.3d 599, 613 (Tex. App.—Houston [14th
Dist.] 2001, pet. denied) (finding that complaining party had to obtain ruling on their
objection to admissibility and reliability of expert testimony before trial or when evidence
was offered to preserve error). 
          We are unable to locate anywhere in the record a ruling on Pilgrim's Pride's motion,
and Pilgrim's Pride does not direct us to one. Pilgrim's Pride did object at trial to
Funderburk's testimony: "for all the reasons we have on file already with the Court and
the fact that we have a report here that he knows he's not going to testify about anything
in it. He's not supplemented and we object to this witness being allowed to testify at all." 
Following this objection, Smoak's counsel began arguing Funderburk's qualifications and
methodologies. The trial court stated: "I think his objection goes to failure to supplement." 
Pilgrim's Pride's counsel affirmed, "That's right." Counsel for both sides then argued to the
trial court on the failure to supplement. The trial court ultimately determined Smoak did not
have a duty to supplement and overruled Pilgrim's Pride's objection. The affirmation by
Pilgrim's Pride's counsel that their objection was for failure to supplement, together with the
argument and ultimate adverse ruling of the trial court following that objection, make clear
that Pilgrim's Pride's trial objection did not preserve error for their contention on appeal that
Funderburk was unqualified or relied on unsound methodology. To preserve a complaint
for our review, a party must have presented to the trial court a timely request, objection,
or motion that states the specific grounds for the desired ruling, if they are not apparent
from the context of the request, objection, or motion. See Tex. R. App. P. 33.1(a); see also
Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint
is waived. See Bushell v. Dean, 803 S.W.2d 711, 712 (Tex. 1991). In addition, an adverse
ruling must be obtained from the trial court, either expressly or implicitly. Tex. R. App. P.
33.1(a)(2). Pilgrim's Pride affirmed to the trial court that their objection was for failure to
supplement discovery, and they failed to obtain an adverse ruling, either expressly or
implicitly, on any objection to Funderburk's qualifications or methodology. Pilgrim's Pride
therefore failed to preserve error on their objections to Funderburk's qualifications and
methodology.


 Their objection for failing to supplement, however, was clearly preserved. 
          2. No Evidence 
          Pilgrim's Pride argues, nonetheless, that Funderburk's opinions constituted no
evidence, and as such, no ruling on their objection was required. The Texas Supreme
Court has recently held that when a challenge to an expert witness' opinions is restricted
to the face of the record, then a party may challenge the legal sufficiency of the evidence
even in the absence of any objection to its admissibility. Coastal Transport Company, Inc.
v. Crown Central Petroleum Corp., No. 01-0301, 2004 Tex. LEXIS 441 (Tex. May 14,
2004). However, when a reliability challenge requires the court to evaluate the underlying
methodology, technique, or foundational data used by the expert, an objection must be
timely made so that the trial court has the opportunity to conduct this analysis. Id. 
          There are other rare cases when an expert's testimony, offered without objection
or a ruling, can be regarded on appeal as no evidence. This arises where the assumptions
or facts on which the expert expressly bases his or her opinion are unproven or shown to
be undisputedly wrong. 
          In Crye, 907 S.W.2d at 499, the plaintiff's expert testified a Polysporin spray caused
the plaintiff to suffer from frostbite. He based that opinion on the assumption there was no
redness on the plaintiff's foot after the spray was applied. Id. The expert testified that, if
the plaintiff's foot was red after the spray was applied, his diagnosis would have been
different. Id. The plaintiff testified in a deposition, and her husband testified at trial, that
her foot was red after the spray was applied, and no evidence was offered to the contrary. 
Id. The Burroughs court found that the expert's testimony constituted no evidence the
Polysporin spray caused the plaintiff's frostbite, because it was based on assumed facts
which varied materially from the actual, undisputed facts. Id.
          In Schaefer v. Tex. Employers' Ins. Ass'n, 612 S.W.2d 199, 202–04 (Tex. 1980), an
expert testified that, in his opinion, Schaefer's disease resulted from his employment. The
expert based his opinion on his assumptions that Schaefer had contracted the avian form
of a certain disease, that the pathogen causing the disease was present in bird droppings
at Schaefer's workplace, and that Schaefer had contracted the disease from the bird
droppings. Id. No evidence was introduced to show that Schaefer had the avian form of
the disease. Id. at 204. No evidence was introduced to show that bird droppings at
Schaefer's workplace were infected with the pathogen. Id. Likewise, no evidence was
introduced to show how Schaefer contracted the disease. Id. Based on that record, the
court held the expert's opinion was no evidence because it was founded on mere
possibility, speculation, and surmise. Id. at 204–05. 
          In this case, Pilgrim Pride's challenge to Funderburk's testimony clearly requires the
court to evaluate the underlying methodology or foundational data used by him in forming
his opinions. As such, Pilgrim's Pride was required to properly object to his expert opinions
and obtain an adverse ruling, which they failed to do. Further, the record does not support
a conclusion that Funderburk's testimony varied materially from undisputed facts, as in
Burroughs, or that it constitutes nothing more than "mere possibility, speculation, and
surmise," as in Schaefer. 
          A review of the record shows that Funderburk relied on the following evidence and
assumptions for his opinions: (1) a projected work-life expectancy of 60.2 or 67 years
based on U.S. Department of Labor figures; (2) a net discount rate of .006, as the
difference between inflation and wage increases over the past 34 years, based on the
Department of Labor statistics; (3) $35,000.00/year as pre-accident earning capacity,
based on a $17.00/hour welding job; and (4) $12,000.00–$25,000.00/year as post-accident earning capacity, based on Smoak's agricultural ventures. 
          The figures obtained from the U.S. Department of Labor in regard to the net
discount rate and work-life expectancy were never questioned. Pilgrim's Pride's main
contention regarding Funderburk's testimony is that his use of the above figures in
calculating Smoak's pre-accident and post-accident earning capacity was based on flawed,
inconsistent, inaccurate, and irrelevant assumptions and methodology. From a review of
the evidence, none of his assumptions were unproven or shown to be undisputedly wrong. 
Testimony from Smoak, along with his tax returns, showed that he was able to work as a
welder before the accident at $17.00/hour and that, in a good year, he could potentially
earn $12,000.00 to $25,000.00/year in his agricultural ventures after the accident. Pilgrim's
Pride attempted to discredit Funderburk's testimony, but they failed to show the testimony
was undisputedly wrong or based on mere speculation or conjecture. 
          Pilgrim's Pride contends Funderburk erred in using a job at which Smoak worked
for only six to seven weeks after the accident to calculate pre-injury earning capacity. 
Pilgrim's Pride contends Smoak never had an hourly job that he held consistently for a year
and that, before the accident, he mainly worked as a self-employed independent
contractor, doing various kinds of seasonal work. Pilgrim's Pride contends the evidence
shows that Smoak earned little to no money on agricultural and seasonal jobs before the
injury, and actually earned more money ($17.00/hour) after the accident. Pilgrim's Pride
concludes that Funderburk's testimony was based on erroneous and inaccurate data and
was, therefore, no evidence. 
          Proof of loss of earning capacity is always uncertain and must be left largely to the
discretion of the jury. McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, 712 (1943). 
Earning capacity has been defined as the "ability and fitness to work in gainful employment
for any type of remuneration, including salary, commissions, and other benefits, whether
or not the person is actually employed." Baccus v. Am. States Ins. Co., 865 S.W.2d 587,
588 (Tex. App.—Fort Worth 1993, no writ); Home Indem. Co. v. Eason, 635 S.W.2d 593,
594 (Tex. App.—Houston [14th Dist.] 1982, no writ). It does not necessarily mean actual
wages, income, or other benefits received during the period inquired about. Baccus, 865
S.W.2d at 588; Eason, 635 S.W.2d at 594–95. Factors such as stamina, efficiency, ability
to work with pain, and the weakness and degenerative changes which naturally result from
an injury and from long-suffered pain are legitimate considerations in determining whether
a person has experienced an impairment in future earning capacity. Reduction in actual
earnings is the best way to show a reduction in earning capacity. Springer v. Baggs, 500
S.W.2d 541, 544–45 (Tex. Civ. App.—Texarkana 1973, writ ref'd n.r.e.). 
          Our courts have, however, consistently upheld judgments for reduced earning
capacity, even though the plaintiff was making as much or even more money after the
injury than before, where it was shown that pain, weakness, diminished functional ability,
or the like indicated that the plaintiff's capacity to get and hold a job, or his or her capacity
for duration, consistency, or efficiency of work, was impaired. Id. Therefore, the fact that
Smoak's actual wages increased for a period of time after surgery does not make
Funderburk's assumptions incorrect.
          Pilgrim's Pride focuses on Funderburk's reliance on a welding job to establish
earning capacity when Smoak never worked a continuous year in that occupation before
the injury. Loss of earning capacity, however, is not measured by what a person actually
earned before injury, but what the worker's capacity to earn a livelihood actually was, even
if he or she had never worked in that capacity in the past. See McIver, 169 S.W.2d at 712
(jury must determine value of minor's loss of earning capacity from its common knowledge
and sense of justice); Crown Plumbing, Inc. v. Petrozak, 751 S.W.2d 936, 938 (Tex.
App.—Houston [14th Dist.] 1988, writ denied); Trailways, Inc. v. Mendoza, 745 S.W.2d 63,
69 (Tex. App.—San Antonio 1987, no writ). In order to recover for diminished earning
capacity in a particular occupation, it is not always necessary for the plaintiff to have been
working in and deriving earnings from that occupation before injury, as long as earnings
from that occupation would provide a true measure of that plaintiff's earning capacity. 
          In King v. Skelly, 452 S.W.2d 691 (Tex. 1970), the plaintiff was permitted to show
his pre-injury earning capacity through testimony regarding what he could have earned
pre-accident without the limitations of the injury. Before his injury, the plaintiff had been
engaged in a variety of jobs, but at the time of his injury he was in business for himself as
a contractor; with his own equipment, and with the aid of three or four employees, his
principle employment was repairing and laying pipelines. Id. at 692. Although there was
no evidence of the plaintiff's prior earnings, he did testify that, before sustaining the injury,
he could have had a job as a pipeline welder and such welders made $14,000.00 to
$17,000.00 per year; he also testified that, before the trial, but after being injured, he
worked three weeks as a pipeline inspector, but driving from site to site caused him too
much pain. Id. at 693. He testified pipeline inspectors earn $650.00 per month. Id. The
court held it would not limit proof of earning capacity merely to evidence of his prior
earnings; instead, evidence of a monetary measure of earning capacity before the injury
is sufficient. Id. The plaintiff's testimony showed he could, by performing the same tasks
in the employ of another which he performed while self-employed, earn from $14,000.00
to $17,000.00 per year. Id. at 694. The court found such evidence was a sufficient
monetary measure of earning capacity before the date of injury. Id.  
          In this case, Funderburk's reliance on Smoak's ability to perform a $17.00/hour
welding job before the accident was not an erroneous monetary measure of earning
capacity. Smoak indicated to Funderburk he was able to perform welding jobs before the
accident, but unable to do so after the accident. Funderburk used the wage Smoak earned
for six weeks as a welder after the accident as an indicator of what Smoak could have
earned before the accident as a welder. He then compared that figure to U.S. Department
of Labor figures on what construction workers make and determined that figure was
accurate. 
          Smoak testified that before the accident he worked in cycles. He testified he would
bale hay, log, and raise cattle, during their respective seasons, but when he could not go
out in the field, or during the winter months, he worked as a welder. He testified he worked
as a welder in 1995, 1996, 1997, and 1998 (the year the wreck occurred). He testified
concerning his income tax returns for those years and explained how his agricultural
ventures posted erratic profits, but he would end up profitable every year through his
welding jobs.


 Smoak therefore had the capacity to work as a welder before the accident. 
Funderburk's use of that occupation to determine Smoak's earning capacity before the
accident was not erroneous. 
          Smoak testified that after the accident he tried to work as a welder, but was unable
to do the bending and stooping required to perform the work. He then had back surgery,
which improved his condition. He testified that, even after the surgery, he could not take
the day-in, day-out standing on the concrete required to perform the welding. 
          There was also testimony supporting Funderburk's assumption Smoak could earn
between $12,000.00 and $25,000.00 after the accident in his agricultural ventures. Smoak
testified that after the surgery in 2001 he began his logging business again, and he had
hauled a few logs with his pickup truck and tractor. He testified that in a good year he felt
he could make between $12,000.00 to $25,000.00 in that capacity. Pilgrim's Pride offered
no evidence to refute this testimony. Smoak's income tax returns show he was capable
of earning that much in the logging business.


 For these reasons, we cannot say
Funderburk's opinions were not supported by the record. 
          Pilgrim's Pride challenged Smoak's inability to work after the accident, but they did
not prove that the assumptions on which Funderburk based his opinions were undisputedly
wrong or erroneous. Pilgrim's Pride pointed out that Smoak's back surgery had
substantially improved his condition and that he reported to his doctor at one checkup he
had zero pain. Smoak testified he was better after the surgery, but he was not "fixed." He
testified he was at a point where the pain was liveable as long as he did not "over exceed
[his] activities." Smoak further testified that on good days he has zero pain, but some
days, the pain is so great he has difficulty getting out of bed. 
          Funderburk's testimony did not vary materially from undisputed facts, as in
Burroughs, or constitute nothing more than "mere possibility, speculation, and surmise,"
as in Schaefer. See also Gen. Motors Corp. v. Sanchez, 997 S.W.2d 584, 591 (Tex.
1999). A review of the record shows that Funderburk relied on facts and assumptions
supported by the record and allowed by law. 
          3. Failure to Supplement 
          Pilgrim's Pride also challenges Funderburk's testimony based on the contention he
changed methodologies at trial, but Smoak did not supplement discovery as required. 
Pilgrim's Pride complains that before trial Funderburk assumed Smoak was unable to work
after the accident, but changed his position shortly before trial and determined Smoak
could work in his agricultural pursuits earning between $12,000.00 and $25,000.00 a year. 
          When a party fails to supplement a discovery response in a timely manner, the
evidence may be excluded. Tex. R. Civ. P. 193.6(a); see also Alvarado v. Farah Mfg. Co.,
830 S.W.2d 911, 914 (Tex. 1992). The remedy is mandatory and automatic unless the
court finds there was good cause for the failure to amend or supplement, or the failure will
not unfairly surprise or prejudice the other party. Tex. R. Civ. P. 193.6(a); Morrow v.
H.E.B., Inc., 714 S.W.2d 297, 297–98 (Tex. 1986). The burden of establishing good cause
or lack of unfair surprise is on the party seeking to introduce the evidence. Tex. R. Civ. P.
193.6(b). The trial court has discretion to determine whether the offering party has met its
burden of showing good cause. Aluminum Co. of Am. v. Bullock, 870 S.W.2d 2, 3 (Tex.
1994). The record must support a finding of good cause or lack of unfair surprise. Tex.
R. Civ. P. 193.6(b). 
          In some instances, the change in an expert's opinion does not require
supplementation. For example, an expert may refine calculations or perfect a report
through the time of trial. Exxon Corp. v. W. Tex. Gathering Co., 868 S.W.2d 299, 304
(Tex. 1993). An expert may also change an opinion without supplementation if the opinion
is an "expansion on an already disclosed subject." Navistar Int'l Transp. Corp. v. Crim
Truck & Tractor Co., 883 S.W.2d 687, 691 (Tex. App.—Texarkana 1994, writ denied). 
However, a party may not present a material alteration of an expert's opinion at trial that
would constitute a surprise attack. See W. Tex. Gathering Co., 868 S.W.2d at 305. The
purpose of requiring timely disclosure of a material change in an expert's opinion is to give
the other party an opportunity to prepare a rebuttal. See id. at 304.
          First, if there is a duty to supplement deposition testimony, see Navistar Int'l Transp.
Corp., 883 S.W.2d at 691, the change here was not a material change to Funderburk's
methodology, as Pilgrim's Pride suggests. Funderburk used the same mathematical
calculations and methods to arrive at future loss of earning capacity pretrial as he did at
trial. The only difference was a change to the post-accident wages variable. This falls
somewhere between a refinement in calculations, see W. Tex. Gathering Co., 868 S.W.2d
at 304, and an expansion of an already disclosed subject, see Navistar Int'l Transp. Corp.,
883 S.W.2d at 691, both of which are admissible without the need for supplementation. 
Second, the record shows Pilgrim's Pride was aware of the change before trial and
therefore was not unfairly surprised or prejudiced by the change. Pilgrim's Pride's counsel
indicated at trial that he was aware of Funderburk's change from the pretrial conference
and that his objection was more to the failure to receive written supplementation of that
change. Under these facts, Pilgrim's Pride was not denied an opportunity to prepare a
rebuttal. The change in Funderburk's calculation which increased Smoak's post-accident
earning capacity from zero to between $12,000.00 and $25,000.00, thereby reducing
Smoak's claim for future loss of earning capacity, actually benefited Pilgrim's Pride. For
these reasons, the trial court did not abuse its discretion by permitting Funderburk to
testify. 
V. NO OR INSUFFICIENT EVIDENCE ON PAST OR FUTURE LOSS OF EARNING
CAPACITY OR FUTURE MEDICAL CARE

          Pilgrim's Pride contends there is no or insufficient evidence of loss of earning
capacity, both past and future, and no or insufficient evidence of future medical care. The
standards of review for legal and factual sufficiency challenges were previously set out in
our discussion of causation. 
          1. Past and Future Lost Earning Capacity
          Likewise, we previously discussed earning capacity and how it is not necessarily the
same as reduced earnings. See Springer, 500 S.W.2d at 544–45. The amount
recoverable for loss of earning capacity is the difference between the amount of money the
plaintiff was capable of earning before the injury and the amount the plaintiff is capable of
earning after the injury. See Mikell v. La Beth, 344 S.W.2d 702, 707 (Tex. Civ.
App.—Houston 1961, writ ref'd n.r.e.). To recover damages for diminished earning
capacity, the plaintiff must demonstrate (1) the existence, i.e., the fact, of an impairment,
and (2) the extent of the loss resulting from the impairment. See Wilkins v. Royal Indem.
Co., 592 S.W.2d 64, 67–68 (Tex. Civ. App.—Tyler 1979, no writ); Springer, 500 S.W.2d
at 544–45 (Tex. App.—Texarkana 1973, writ ref'd n.r.e.). 
          Regarding loss of future earning capacity, the Texas Supreme Court has set out the 
evidence necessary to sustain a judgment as follows: 
In a personal injury suit the amount which the plaintiff might have earned in
the future is always uncertain, and must be left largely to the sound judgment
and discretion of the jury. However, the verdict must be based on something
more than mere conjecture. It must be an intelligent judgment, based upon
such facts as are available. Even where the injury is of such a serious and
permanent nature that loss of earning capacity is the necessary result, proof
is required to show the extent and amount of the damages. No general rule
can be laid down, except that each case must be judged upon its peculiar
facts, and the damages proved with that degree of certainty of which the
case is susceptible. Under this rule the required certainty of the proof will
necessarily vary. Where plaintiff is a child, who has never earned any
money, the jury must determine the value of its lost earning capacity
altogether from their common knowledge and sense of justice. Likewise,
where plaintiff is a housewife, the actual money value of her services need
not be proved. On the other hand, where plaintiff is employed at a fixed
wage or salary, the amount of his previous earnings ordinarily must be
shown. And where plaintiff seeks special damages for loss of his earning
capacity in a particular business or profession, the amount of his earnings or
the value of his services in that business must be shown with reasonable
certainty. The certainty of the proof required is also affected by the nature
of plaintiff's injuries. If plaintiff's earning capacity is not totally destroyed, but
only impaired, the extent of his loss can best be shown by comparing his
actual earnings before and after his injury. 

McIver, 169 S.W.2d at 712 (citations omitted).
            In this case, the jury awarded $37,500.00 for past loss of earning capacity and
$200,000.00 for future loss of earning capacity. 
          Evidence concerning the medical procedures made necessary by Smoak's injury,
as well as the pain he suffered, establish his impairment and diminished ability to work
after the accident until the time of trial. Smoak testified that, after the accident, his back
injury caused severe pain which radiated into his right leg, causing numbness and tingling
into his toes. The accident occurred in November 1998, and he attempted to work for the
first time in March 1999. He testified he attempted to work at various jobs, including
welding, but could not endure the severe lower back pain or the bending and stooping
required. He also attempted to bale hay, but was unable to do so. He hired several people
to run his hay baling operation, but sustained losses in that business until the bank
foreclosed on the equipment. 
          He testified that in August 1999 he underwent intradiskal electrothermal therapy
(IDET), which required him to wear a brace and stay inactive for six weeks. The
procedure, however, did not control the pain in his back. He did not attempt to work again
until January 2000. In October 2000, he was hospitalized for back spasms. In February
2001, he underwent spinal fusion surgery on his back. He testified the surgery was not a
complete cure, but did improve his condition. He testified the pain was within toleration
after the surgery, but he could still not take the day-in, day-out activities required to perform
a welding job. Smoak testified he tried to do various jobs after the surgery, but he was
limited, and if he tried to do too much, he would "pay the price for it." 
          Further, the jury was not left to mere conjecture in determining the extent of
Smoak's loss from the time of the accident to the time of trial. Funderburk testified Smoak
had the capacity to earn $35,000.00 a year as a welder before the accident. As previously
discussed, this provided the jury with a reasonable monetary measure of Smoak's earning
capacity before trial. See King, 452 S.W.2d at 692–93; Petrozak, 751 S.W.2d at 938. 
Smoak testified that, as a result of his injuries, he was unable to sustain a welding job
because of the pain. The accident occurred in November 1998, and the trial took place in
September 2002. His income tax returns for those years reflect a range in income that
included a loss of $7,566.03 in 1999 and a profit of $10,003.20 in 2000. Funderburk and
Smoak testified he had the capacity to earn between $12,000.00 and $25,000.00 in his
agricultural ventures after the accident. The difference between what he could have made
before the accident as a welder and what his capacity to earn after the accident in his
agricultural ventures was $10,000.00. This sum, multiplied by the four years from the
accident to the date of trial, yields a loss of past earning capacity of $40,000.00. The jury's
verdict of $37,500.00 was reasonable and based on legally and factually sufficient
evidence. 
          The jury returned a verdict of $200,000.00 for loss of future earning capacity. As
just outlined, Smoak testified to the fact of impairment. The jury was not left to mere
conjecture on the measure of loss of future earning capacity, because Funderburk again
provided a specific valuation. Funderburk provided the jury with a range from $254,000.00
to $705,094.00 as the loss of future earning capacity Smoak is likely to suffer from the
accident. The jury's verdict of $200,000.00 was not unreasonable, or so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.
          Pilgrim's Pride contends certain evidence negates a recovery for loss of earning
capacity. Pilgrim's Pride points out Smoak underwent a physical examination by his
employer five to six months after the accident and was cleared to work. Smoak testified
that he was not examined by a doctor and that the examination was very brief. Pilgrim's
Pride also points out Smoak did not disclose to employers any physical limitations related
to his back. Smoak testified he lied on the applications to obtain employment. Finally,
Pilgrim's Pride points out Smoak was granted work-release by his surgeon, with "no work
restrictions." Smoak testified that he tried many jobs after the surgery, but determined that
the pain was too great to perform some of them, including welding. Smoak's surgeon
testified the surgery was a success, but noted that after surgery "our bodies are never the
same." Smoak's general physician testified he would put Smoak on a fifty-pound lifting
limitation. 
          We do not pass on the credibility of the witnesses, and we do not substitute our
opinion for that of the trier of fact, even if there is conflicting evidence on which a different
conclusion could be supported. Clancy, 705 S.W.2d at 826. There is evidence Smoak has
diminished earning capacity even after his surgery, and the verdict is not so against the
great weight and preponderance of the evidence as to be manifestly unjust.
          2. Future Medical Care
          Pilgrim's Pride also contends there is no or insufficient evidence to sustain the jury's
award of $25,000.00 for future medical care. 
          Recovery for future medical expenses requires a showing there is a reasonable
probability such medical expenses will be incurred in the future. Fibreboard Corp. v. Pool,
813 S.W.2d 658, 681 (Tex. App.—Texarkana 1991, writ denied). Likelihood and
probability are synonymous. Id. The word probable conveys a meaning of more likely than
not. Id. Quantifying probability, it means a more than fifty percent chance. Id. The
plaintiff must also show the reasonable cost of the probable future medical care. 
Rosenboom Mach. & Tool, Inc. v. Machala, 995 S.W.2d 817, 828 (Tex. App.—Houston
[1st Dist.] 1999, pet. denied). The jury can determine the amount of probable future
medical expenses based on the nature and course of the injuries or disability, the medical
care rendered before trial, past medical expenses, and the condition of the injured party
at the time of trial. Id. The plaintiff is not required to establish the future medical
consequences of his or her injury by expert medical testimony grounded only on
reasonable medical probability. Dougherty v. Gifford, 826 S.W.2d 668, 680 (Tex.
App.—Texarkana 1992, no writ). 
          The testimony on future medical expenses was as follows. Smoak testified further
treatment was a possibility, "[y]ou don't really know, you know, once the hardware wears
out or if the bone graft doesn't go -- you know, you don't really never know." Guy
Danielson, III, M.D., Smoak's surgeon, testified that more likely than not the hardware
inside Smoak's back will stay there for the rest of his life. He testified future problems for
Smoak likely include "additional stress . . . on some of the other places in the spine above
and below where the fusion is done," and a "likelihood that he [will] develop . . . arthritic
changes in that area earlier than would be expected." 
          This testimony does not show a reasonable probability of medical expenses in the
future. There was no testimony Smoak would require any additional medical procedures
in the future beyond mere possibilities. This does not meet the requirements for a
judgment for future medical expenses. See Pool, 813 S.W.2d at 681. We therefore
reverse and render judgment that Smoak take nothing regarding future medical care. 
VI. CONCLUSION 
          We reverse and render judgment that Smoak take nothing in regard to future
medical care because there was no evidence of the reasonable probability for the need of
such care. We affirm the judgment of the trial court in all other respects. 


                                                                           Donald R. Ross
                                                                           Justice


Date Submitted:      April 22, 2004
Date Decided:         May 19, 2004